**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS  DIVISION**

| | | |
|---|---|---|
| **DANIEL J. WICKENS and PAMELA M. WICKENS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **1:05-CV-645-SEB-JPG** |
| **vs.** | ) | |
| | ) | |
| **SHELL OIL COMPANY and SHELL OIL PRODUCTS COMPANY, LLC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS

Plaintiffs, Daniel and Pamela Wickens, are the last proprietors of a family-owned custom shoe and shoe repair business in Anderson, Indiana. The business flourished for about 50 years, but, in 2004, the Wickenses decided to retire and closed the business, seeking to sell the property from which it had operated since 1953.  Because the property had been used as a gasoline station prior to 1953, an environmental evaluation was required prior to a sale.  The results of that environmental evaluation suggested petroleum contamination below the surface.  Additional soil and groundwater environmental testing was undertaken which confirmed that the property is contaminated with gasoline and fuel oil hydrocarbons; the gasoline

contaminant levels in fact are greater than the state residential standards and, in some instances, greater even than industrial standards.

The contamination findings for the property required notification of the Indiana Department of Environmental Management ("IDEM").  IDEM has notified the Wickenses of the need for further investigation to determine the scope of the contamination or "release."  The Wickenses immediately contacted the Defendant Shell Oil entities (collectively "Shell") regarding the contamination and requested that Shell communicate with IDEM and take over the investigation and potential clean-up of the property.  Shell and its predecessor had owned and operated a gasoline filling station which utilized an underground storage tank ("UST") on the property for more than twenty-five years prior to selling the property to the parents of Daniel Wickens in 1953. Shell did not respond promptly to the request made by the Wickenses and, when it did, it denied their request that Shell assume responsibility for further work on the property.  As a result, Plaintiffs filed this lawsuit in nine counts attempting to force Shell to assume responsibility for further investigation and clean-up and to recover damages.

Shell claims that the contamination on the site is not the result of its past activities and that the UST located on the property is not subject to the Indiana environmental statutes which allow a property owner to seek contribution for clean up from the tank's past owner.  Further, Shell contends

that some, if not all, of the contamination resulted from leaks from fuel oil tanks kept by the Wickenses on the property for heating purposes and from the migration of gasoline contaminants from a nearby property where another gasoline filing station more recently was located.

Both sides have filed for summary judgment on all or some of the claims brought in the lawsuit.  For the reasons discussed in this entry, we hold that Shell is entitled to summary judgment on certain of the counts raised in the complaint; however, the heart of the dispute remains subject to material questions of fact which prevent us from entering any dispositive ruling(s) at this point.  In addition to the cross requests for summary judgment, the parties' motion practice has proliferated with respect to discovery and expert reports, placing a number of additional disputes before us to resolve, some of which we also therefore address in this entry.

### ***Summary Judgment Standard***

In addressing cross motions for summary judgment, we may grant summary judgment (in whole or in part) or deny (in whole or in part) either or both parties' motions.  The standard for determining whether a summary judgment should issue is unchanged from that which applies when only one party has sought relief.  Summary judgment is available if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law.  To determine whether any genuine factual issue exists, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record.  *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir.2001). The Court also draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings to support his contentions with properly admissible evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## ***Discussion***

### Count I - Corrective Action Costs - Ind. Code § 13-23-13-8

Article 23 of the Indiana Code regulates underground storage tanks. Chapter 13 of Article 23 vests in the Commissioner of IDEM the authority to require that "corrective action" be taken with regard to the release of any regulated substance from a UST.  Ind. Code § 13-23-13-1.  The owner of the property where the UST is located can be required to address a release or pay the costs of any emergency corrective action taken by the state.  Ind. Code § 13-23-13-8(a).  However, a current owner is entitled to contribution from

anyone who owned or operated the UST at the time of the release.  Ind. Code §

13-23-13-8(b).  The court is the ultimate arbiter of cost allocations.  *Id.*  Count

I of Plaintiffs' Complaint seeks contribution from Shell.

Shell argues it is entitled to summary judgment on Count I because

Article 23 of the Indiana Code does not apply to this UST and, even if it did, no

corrective action is necessary.  We find no support for either of these

contentions.  Shell notes that this particular UST was taken out of service prior

to 1974, which date triggers the notification requirement under the federal

Solid Waste Disposal Act.  42 U.S.C. § 6991a(2)(a).  Shell therefore contends

that the reference to the UST notification requirements of the federal Solid

Waste Disposal Act contained in the <u>minimum</u> requirements for IDEM rule-

making which are set forth in the first chapter of Article 23 of the Indiana

Code, *see* Ind. Code § 13-23-1-2(c)(8),  should be read to limit Indiana's entire

UST statutory scheme only to UST's in operation after 1974.  We find this

statutory interpretation to be needlessly tortured and legally unfounded,

attempting as it does to graft a heretofore undiscovered and implied

contingency onto an entire Article of the Indiana Code.  Accordingly, we are

unpersuaded  by Shell's initial argument.

Apparently anticipating that the Court might not be convinced by its first

argument, Shell alternatively asks us to find that no "corrective action" is

required at the site, thus entitling it to summary judgment.  According to Shell,

its expert concluded that this contamination poses no danger to the environment or human health and therefore no remedial activity is necessary. Unfortunately for Shell, the General Assembly vested the authority to make such determinations in IDEM, not in Shell's expert, and IDEM continues to request that Plaintiffs and Shell undertake additional investigative, and perhaps remedial, steps.  Further, assuming a release from the UST has occurred, as we do in examining the evidence in a light most favorable to the non-moving party, the term "corrective action," as used in Ind. Code § 13-23-13-8, is clearly broad enough to include the efforts already undertaken to identify the contaminants and measure their concentration in the soil and groundwater.  So, even if nothing further is required to remediate, "corrective action" has already been taken and more is requested by IDEM.

This leaves Plaintiffs' contention that summary judgment in its favor is appropriate with respect to Shell's liability for gasoline contamination on the subject property.  According to the Wickenses, the combined effect of prior case law in addressing the leaking Shell UST along with the opinion of its expert witness and the undisputed evidence of gasoline contamination suffice as a basis for imposing liability on Shell for 100% of the gasoline contamination. While Plaintiffs' arguments have some convincing force, we are not completely convinced that Shall, and Shell alone, must assume this obligation.  Our hesitancy stems from the possibility raised by Shell, but not fully developed,

that the contamination emanated from another source.  Consequently, we shall

allow Shell a final opportunity to more convincingly rebut Plaintiffs' evidence, if

it can.  Without more from Shell than the existence of the possibility that the

contamination came from a source other than the UST, Plaintiffs shall prevail

on this claim.  *See Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois,*

424 F.3d 659, 667 (7th Cir. 2005)(non-moving party must offer more than a

scintilla of evidence to avoid summary judgment).

The case relied upon by the Wickenses is *Shell Oil Co. v. Meyer*, 705

N.E.2d 962 (Ind. 1998).[1]  There, the central question was whether Shell, as a

provider of gasoline products to a filling station owner who utilized Shell

branding, should be considered an "operator" under Indiana statutes

applicable to USTs.  *Id.* at 972-74, 977-80.  That case included expert

testimony that a steel underground storage tank of the type placed under that

Shell station, as well as most others of that era, tended to corrode and leak

within thirteen years.  Id. at 981.  Because the Indiana Supreme Court ruled,

based on the evidence submitted, that it was more probable than not that the

UST at issue leaked during the time Shell was found to be an operator, *Id.* 981,

Plaintiffs here seek to have us accept that finding of fact as controlling of our

---

[1]Plaintiffs also cite as support for various factual and legal contentions the decision of the Indiana Court of Appeals in the same case, *Shell Oil Co. v. Meyer*, 684 N.E.2d 504 (Ind. App. 1997).  That decision, however, has no precedential value as it was thereafter accepted for review by the Indiana Supreme Court.

conclusion here.  Despite the similarities, that holding does not resolve the issues presented here.

Given their reliance on the *Meyer* case, Plaintiffs not surprisingly retained one of the same corrosion experts who testified in *Meyer* who again opines that the soil conditions are such that the UST on the Wickenses' property would have begun leaking within eight years of installation.  The expert also testified that the hard clay soil would have caused the leak to proceed at a very slow rate, making early detection highly improbable. Plaintiffs claim that this expert opinion provides ample evidence to require Shell to take responsibility for 100% of the gasoline contamination on the property.  Their evidence, considered in light of the contrary evidence offered by Shell that the possibility exists for some gasoline contaminants to have migrated from a nearby property, create a factual dispute we can not resolve on summary judgment.

Plaintiffs also cite evidence of gasoline contamination on the property based on the expert environmental surveys undertaken to assess the initial and follow-up investigations.  Soil borings, groundwater samples and the like all point to greater concentrations in the area of the property where the UST was located.  Shell does not dispute that its own experts have, in some respects, confirmed the existence of gasoline contamination likely to have

originated from the UST on the property, though Shell's experts have also suggested alternative sources for at least some of the contamination.

In summary, while it is clear from the evidence that Shell bears some responsibility for gasoline contamination on the site, we can not conclude that it is responsible for 100 per cent of that contamination. Shell has pursued a third-party claim against the owner of a nearby property which also utilized a UST in conjunction with its operation of a gasoline filling station. While the likelihood that contaminants from that property flowed in a direction opposite to the natural groundwater flow between the properties is remote, it remains a possibility. A scintilla is not easy to measure, but we know it isn't very much. Accordingly, Shell has provided the required scintilla of evidence to avoid a determination on summary judgment that it is 100 per cent liable for any petroleum contamination which otherwise must be covered by the Wickenses.

## Count II - Release of Hazardous Substance - Ind. Code § 13-30-9-2

Remediation of a release of a hazardous substance may be obtained in Indiana by bringing an action pursuant to Ind. Code § 13-30-9-2. However, Plaintiffs have previously voluntarily dismissed Count II of their complaint, relying on Count I as a suitable alternative. We thus regard Count II as withdrawn.

**Count III - Release from a Petroleum Facility - Ind. Code § 13-24-1-4**

Plaintiffs claim that Shell is liable under the Indiana statutes regulating releases from petroleum facilities, namely, Article 24 of Title 13.  However, the Indiana General Assembly has chosen specifically to exclude underground storage tanks from its definition of "petroleum facility."  Ind. Code § 13-11-2-161.  Under Indiana law, USTs are addressed instead in two specific statutes allowing for the recovery of costs associated with releases from USTs.  Ind. Code § 13-30-9-6.  Plaintiffs' Complaint specifically alleges that the contamination on their property resulted from a leaking UST.

In any event, our reading of Article 24 of Title 13 suggests that it does not cover historic releases but targets instead releases from existing facilities by authorizing IDEM to take certain immediate emergency actions and to recover those costs.  The statute does not create a private cause of action such as that asserted here  by the Wickenses.  Accordingly, summary judgment in favor of Shell is appropriate on Count III.

**Count IV - Solid Waste Dumping - Ind. Code § 13-30-3-13**

Count IV seeks recovery from Shell for "illegally dumping solid wastes on the Wickens' (sic) property."  Shell claims it is entitled to summary judgment on this claim because, if any gasoline leak occurred on the property, it was not from "discarded material," as referenced in the Title 13 definition of "solid

waste." Ind. Code § 13-11-2-205; *see also, Walling v. Appel Service Co., Inc.*, 641 N.E.2d 647 (Ind. App. 1994).  Further, Shell contends that Plaintiffs' theory of recovery exceeds what is authorized under Indiana statutes, which limits recoveries by a landowner to two (and only two) options for the costs of UST remediation.  Ind. Code § 13-30-9-6.

In their response brief, the Wickenses contend that Shell has produced no evidence to show that gasoline was not left or "discarded" in the tank at the time the property was sold to Daniel's parents.  This argument, however, ignores the principles relating to burden of proof in the lawsuit.  It is the Wickenses who must prove that they are entitled to recover for cleaning up illegal solid waste which was dumped on the property and even they admit that their entitlement to a statutory remedy under Ind. Code § 13-30-3-13 "presents a close question."  In our view, it is not a "close enough" question to survive summary judgment.

The Indiana Court of Appeals ruled in *Walling* that the ordinary meaning of "discarded material" includes material which was "thrown away," "abandoned" or "disposed of."  *Walling*, 641 N.E.2d at 650.  Plaintiffs have mustered no evidence to suggest that the contamination here occurred from anything other than the leaking UST over the years it was used by Shell.  If their own expert is to be believed, Plaintiffs did not own the property at the time the tank began leaking, which is another fact precluding recovery under

-11-

Ind. Code § 13-30-3-13.  We agree with Shell that, by limiting the bases for recovery for UST leakage to the two statutory options, the Indiana legislature has foreclosed all other avenues of relief.  Ind. Code § 13-30-9-6.  Therefore, Shell is entitled to judgment on Count IV.

**Count V - Trespass & Count VI - Nuisance**

In addition to the other theories advanced by Plaintiffs, the Wickenses have pursued common law remedies as well, including trespass and nuisance. These theories ordinarily are pursued in order to cure damages visited upon one's property by a stranger or neighbor.  The Wickenses' characterization of the petroleum contamination left in the ground by Shell constituted a trespass and nuisance is a bridge too far in terms of establishing liability.

Plaintiffs claim that the leak in the UST predated the sale of the property by Shell to Daniel Wickens' parents in 1953, which fact undermines their trespass theory: one can not trespass on one's own land, and thus Shell, who owned the  property during the period that the UST was used to store gasoline, cannot be deemed to have trespassed on it.  Plaintiffs' nuisance theory fares no better.  Historically, a nuisance theory provides a basis for resolving conflicts between the uses of neighboring lands.  1 Am. Jur. 2d *Adjoining Landowners* § 11.  We concur in Judge Hamilton's position clearly laid out in *Lilly Industries, Inc. V. Health-Chem Corp.*, 974 F.Supp 702 (S.D. Ind. 1997), which held that,

under Indiana law, the subsequent purchaser of real property may not sue a former owner for nuisance or trespass based upon actions taken by the former landowner while in lawful possession of the property. Recently, heretofore undiscovered environmental pollution on real property seems to have fostered imaginative attempts to construct or expand on a common law tort theory of recovery. *Id.* at 703. But these efforts have not found support under Indiana law since the state courts have declined to utilize trespass or nuisance doctrines to resolve environmental clean-up disputes.[2] Consequently, summary judgment in favor of Shell is warranted on Counts V and VI.

**Count VII - Negligence**

In addition to Plaintiffs' common law theories of trespass and nuisance, they have advanced a claim of negligence against Shell, alleging that the petroleum contamination was the result of Shell's operating the filling station in a less than reasonable manner and negligently closing the UST. Shell counters that it had no legal duty to the Wickenses or to any subsequent

---

[2]For the first time in this litigation, the Wickenses asserted in their response brief that they purchased property adjacent to that which their predecessors in interest purchased from Shell and that this adjacent property has suffered contamination from the UST as well. On this basis, the Wickenses argue that trespass and nuisance claims might still be available. However, if there is contaminated land other than that which was purchased from Shell, it is not the subject of the complaint filed in this action, which omits mention of any claim for contamination to property other than property once owned by Shell. Further, the case management plan submitted by the parties fails to include any mention of contamination of Wickenses property not purchased from or otherwise caused by Shell. Accordingly, we do not include in our analysis here anything regarding the alleged second parcel.

landowner and, even if it did, the statute of limitations prevents any action against it based on a negligence theory.  Because we agree that Shell owed no duty to the Plaintiffs, we need not reach the second issue.

Shell cites as support for its lack of liability for negligence a district court decision from Massachusetts which held that no duty was owed to subsequent landowners.  *Wellesley Hills Realty Trust v. Mobil Oil Corp.*, 747 F.Supp. 93 (D.Mass. 1990).  Though *Wellesley Hills* obviously is not based on Indiana law, the case provides some parallels to the circumstances at bar and has been cited by numerous other trial courts considering whether a landowner owes a duty to unknown future landowners.  *Wellesley Hills* involved a plaintiff who sought to have the costs of remediation of its property paid for by a petroleum company which several years prior had owned and operated a gasoline station on the property which was discovered to have been contaminated by the release of petroleum products.  *Id* at 94-95.  The plaintiff in *Wellesley Hills* did not directly purchase the property from the gasoline station owner/operator, but had obtained it from the intervening purchaser who had acquired it from the owner/operator.  *Id.* at 94. The plaintiff in *Wellesley Hills* purchased the property knowing that it was contaminated.  *Id.*

In addition to seeking recovery under the Massachusetts environmental statutes, the plaintiff advanced several tort theories against the petroleum company.  For reasons similar to those discussed in the *Lilly Industries*

-14-

decision, the district court in *Wellesley Hills* found no viable basis for either a

trespass or nuisance claim and also dismissed claims of negligence, negligent

supervision and strict liability against the petroleum company.  *Id*. at 98-99.

In noting that tort theories are generally grounded in duties owed as a result of

the relationship between parties while acknowledging that landowners do owe

certain duties to others, the court explained the reasons for not extending

those duties to unknown future landowners:

> This Court, however, is aware of no legal authority which would
> support the imposition of a duty on an owner of land to maintain
> his or her property in a certain condition or to refrain from any
> activity affecting the property which would extend to future owners
> of the land.  The imposition of such a duty would be unreasonable
> because such future owners may not be known or even
> contemplated at the time the landowner creates or maintains a
> condition on his or her property.  Moreover, such a duty would
> unreasonably interfere with a landowner's right of ownership; the
> right to do with his or her property as desired without liability so
> long as he or she does not interfere with the interests of others.
> Thus this Court concludes, as a matter of law, that Mobil did not
> owe a duty to WHRT to ensure or to supervise its employees to
> ensure there were no releases of oil or hazardous material on the
> property while Mobil owned and possessed the property.

*Id*. at 100.  Other courts have reached similar conclusions under

circumstances resembling those presented here, citing favorably the *Wellesley*

*Hills* decision.   *Jones v. Texaco, Inc.*, 945 F.Supp. 1037, 1047 (S.D. Tex.

1996);*Vross Oil Co. v. Phillips Petroleum Co.*, 944 F.Supp. 787, 791 (E.D. Mo.

1996); *Dartron Corp. v. Uniroyal Chemical Co.,* 893 F.Supp. 730, 738 (N.D. Ohio

1995); *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*, 778 F.Supp. 101, 104 (D.

R.I. 1991).

In response to Shell's argument that it owed no duty to future landowners, Plaintiffs reference two cases suggesting that the Indiana Supreme Court would recognize such a duty:  First, an unpublished decision of a state trial court involving a municipality's efforts to recover for environmental damages to certain land, wherein, without benefit of any analysis or explanation, the court permitted plaintiff's claims of negligence, trespass and nuisance to survive a summary judgment challenge.  *City of South Bend v. Century Indemnity*, Cause No. 49F12-0303-PL-000752 (August 8, 2005 Order on Pending Motions).  Despite Plaintiffs' assurances that the circumstances in the *City of South Bend* case were similar to our case and that the opinions of that court deserve special weight because it has been specially designated to hear environmental matters, we remain unpersuaded, largely because the trial court's opinion totally omits any explanation of the underlying circumstances or the reasons for its denial.

The Wickenses next cite *Peters v. Forster*, 804 N.E.2d 736 (Ind. 2004), in which, they contend, the Indiana Supreme Court signaled its support for a more modern rule of forseeability in applying negligence principles, thereby suggesting a basis for holding a landowner liable to subsequent landowners in tort for gasoline contamination since that injury was reasonably foreseeable. We do not read *Peters* to stand for that principle.

In *Peters,* the Indiana Supreme Court ruled that a contractor who built an accessibility ramp at a residence could be found liable in negligence to a guest at the home who was injured while using the ramp. *Id.* at 742. In reaching that decision, the court rejected previous decisions employing the "acceptance rule", which insulated a contractor from liability to a third party once the work was accepted by the owner. *Id.* at 739-40. While the principle of "forseeability" of injury resulting from faulty workmanship played a major role in the court's analysis, we do not view the *Peters* decision as applicable here, for the following reasons:

First, the experts in the case at bar all agree that the means for detecting the type of UST release that allegedly occurred here were not readily available in the 1940's or 1950's and, in fact, the phenomenon of adverse environmental impact from petroleum product leaks was rarely recognized or deemed actionable. Furthermore, any duty on the part of a common law landowner to future owners of the same property is not compelling in view of the approach taken by the General Assembly in specifically providing the methodology for cleaning-up these types of releases and the cost allocation procedures. The landowner is hardly without a remedy, under Indiana law. We are of the opinion that the Indiana Supreme Court would view the circumstances here as consistent with *Wellesley Hills*, which is to say, as involving the application of contract and statutory law principles. The relationship between Shell and the

Wickenses does not implicate common law principles; rather, their relationship arose under their contract and their commitments ran with the land and are subject to the statutory environmental clean-up regulations adopted by the State.  No action in negligence lies here and summary judgment in favor of Shell is therefore once again appropriate.

## Count VIII - Breach of Duty of Good Faith

Count VIII asserts Plaintiffs' contract-based claims.  The Wickenses, who inherited a portion of the property and purchased the remainder from Daniel's siblings, allege that Shell breached its duty of good faith under the contract of sale which transferred title to  the land to Daniel's parents, Joseph and Zelda Wickens.  Though the parties appear to agree that a contract of sale existed at the time the property was transferred, no such contract has been proffered for our review; the only document made of record and submitted to us is the deed. Plaintiffs contend that the missing sales contract as well as all other information reflecting the relevant terms of such a transfer document is an omission for which Shell is entirely responsible.  We can think of no good and valid reason why Shell should be required to shoulder sole responsibility for this absence of evidence, especially since to do so ignores the reality that Plaintiffs have the burden of proof in this matter.[3]

---

[3] We note in passing our view that the hyperbole and vitriol resorted to by Plaintiffs in their briefing detracts from the strength of some of their best arguments.

-18-

Shell properly notes that Indiana does not read a duty of good faith and fair dealing into every contract. *First Federal Sav. Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990); *Hispanic College Fund, Inc. v. National Collegiate Athletic Association,* 826 N.E.2d 652, 658 (Ind. App. 2005). Having before us only the deed as evidence of the transfer of the property, we are hard-pressed to determine whether the contract of sale included any expressed, ongoing duty of good faith and fair dealing – we say "ongoing" duty, because there is absolutely no evidence that Shell was aware of any problem with the property in 1953 when it was transferred to Daniel's parents.

In interpreting any contract under Indiana law, the court is obligated to attempt to divine the parties' intent based, if possible, on the plain language of the contract and then to enforce those intentions. *First Federal Savings Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d at 604. Many substantial questions have gone unanswered here and prevent us from determining with any certainty what the parties intended: for example, what was the intent of the parties, in conducting the sale and transfer of the real estate in 1953, concerning Shell's continuing responsibility for hidden defects and, assuming such responsibility was anticipated and allocated, what was their intention with respect to enforcement of the contract by themselves or by future owners of the property?

The deed provides that Joseph and Zelda Wickens took the property "subject, however, to all rights-of-way, easements, building lines, reservations, restrictions and encumbrances of record, to all zoning laws and ordinances, to any existing tenancies, and to any state of facts and deficiencies in area an accurate survey would show." The Wickenses maintain that, since the contamination was a defect in the property that could not have been detected by survey at the time, Shell remained responsible for that condition. Since Daniel, as an heir, received a portion of the property and, along with his wife, purchased the remaining parcel, he has privity under the contract and the resultant right to enforce the contract. Shell counters that there was no express reservation of responsibility for hidden defects and, since at that time environmental defects as such were not generally recognized, the parties could not have intended in connection with the transfer of the property that Shell would remain responsible for such conditions.

Piecing together an appropriate analysis of this count has proven to be a challenge and, because the arguments and briefing of both parties are marked by a scarcity of legal authority, we infer that counsel for the parties confronted similar difficulties in framing their arguments. We construe the relevant issue to be whether the express representation in the contract that the Wickenses took the property subject to deficiencies, facts and conditions that could be determined from a survey created an implied covenant that Shell would remain

responsible for deficiencies or conditions that a survey could not disclose.  The apparent simplicity and straight-forwardness of this statement of the legal issue belies its complexity, however; in fact it spawns many related issues beyond those the parties have addressed in their briefing.  We wonder, for example, whether the doctrine of *caveat emptor* is at odds with such an implied covenant. Does Shells' retained responsibility arise from a good faith obligation inferred from the express language of the contract?  Is the remedy for a hidden defect in the property such as to make the transfer voidable or permit recision of the original agreement?  Is contamination an encumbrance on marketable title?  Of what effect is the fact that the title was transferred with a 20-year condition which could have resulted in a reversion of title to the property to Shell?  Or, does the fact that the existence of this type of defect in real property was not recognized at the time of the sale amount to discovery of a contingency having no effect on the agreed to contractual obligations?  Finally, we wonder if a warranty was implied here, as opposed to some other form of contractual obligation?  Assuming all the material facts are before us, we are nonetheless far from confident that the parties' briefs have addressed all the relevant considerations or brought us to a position where we can resolve this part of their dispute.  We therefore decline to grant summary judgment on Count VII.

**Count IX - Breach of Warranty/Failure to Disclose**

Plaintiffs claim in this count that Shell breached express and implied warranties and also failed to disclose the contaminated nature of the property. The deed lacks any mention of any express warranties and Shell argues that no other warranties may be implied.  If any warranties were extended, Shell emphasizes, they were made only to Joseph and Zelda Wickens, and not to Plaintiffs.

We do not accept Shell's argument that the Wickenses are not in a position to enforce a warranty, if one was created directly or by implication. Successors in interest in real property may sue on the contract setting forth the original obligation either directly or by implication.  *See Barnes v. Mac Brown & Co., Inc.*, 342 N.E. 2d 619 (Ind. 1976)*; Tanton v. Grochow*, 707 N.E.2d 1010 (Ind. App. 1999).  The deficiency here in Plaintiffs' claim is that there is no evidence of any express warranty and Indiana law does not permit one to arise by implication under these circumstances.

Indiana recognizes an implied warranty of habitability with the sale of property, but only as to builder-vendors.  *Carroll's Mobile Homes, Inc. v. Hedegard,* 744 N.E.2d 1049, 1051 (Ind. App. 2001).  In *HM Holdings, Inc. v. Rankin*, 70 F.3d 933 (1995), the Seventh Circuit was faced with a somewhat similar situation; the purchaser of land, which turned out to be

environmentally contaminated, was unable to sell the property and sought to disavow the remainder of the installment purchase agreement and to claim damages. The court in *HM Holdings* had the benefit of being able to review a sales contract in determining that there was no express warranty and, under Indiana law, no such warranty could be implied. *Id.* at 936-37. In the case at bar, Plaintiff, whose obligation it is to prove a claimed breach of warranty, has presented no evidence of an express warranty. The fact that the parents took the property subject to conditions that could be determined through a survey does not give rise to an express warranty of no contamination. And, as in *HM Holdings*, we find no basis in Indiana law to imply a warranty. Summary judgment is thus required on this count in favor of Shell.

**Particular Forms of Relief Requested**

In its motion for summary judgment, Shell has asked us to hold that certain types of relief sought by Plaintiffs are not available. In addition to recovering the costs of any corrective action required to put the property in an environmental condition acceptable to the State, Plaintiffs have asked that the Court:

1.  require Shell to perform all clean-up work necessary to remove any petroleum contamination, as well as to underwrite all past or future related expenses;

2.  award damages in Plaintiffs' favor in an amount equal to the

diminished value of the property as a result of any petroleum contamination;

3.  remunerate Plaintiffs for the personal time they have invested in resolving the situation;

4.  award exemplary or punitive damages for Shell's bad faith;

5.  require Shell to pay attorney fees and prejudgment interest.

Shell seeks a denial of each of these requests for relief to the extent Plaintiffs seek: 1) damages for economic loss; 2) mandatory injunctive relief; 3) compensation for "personal time;" 4) punitive damages; or 5) attorney fees.

The breach of contract claim which survives theoretically could permit relief beyond that specifically authorized under the two, relevant Indiana statutes regulating USTs.  Even so, the specific claims made in this complaint come within those statutes as clearly being within the contemplation of the Indiana General Assembly when it allocated financial responsibility for UST leaks.  Consequently, the most challenging task confronting the Court in the case at bar will be assigning responsibility for any contamination existing on the property and apportioning money damages.[4]  Certain types of damages are, however, not available in this case.

---

[4] At the conclusion of this ruling, the court has set a date for a settlement conference to be facilitated by the assigned Magistrate Judge.  Often in highly technical cases such as this, involving dueling environmental surveys and expert opinions, the informality of mediation is to be preferred to a jury trial.  Accordingly, we encourage the parties to use their time before the Magistrate Judge to attempt a fair and efficient resolution of this litigation, if at all possible.

Plaintiffs have stipulated that they do not seek economic damages, such as lost profits, but do seek to recover for diminished property value, arguing that such damage is not a form of economic loss.  If Plaintiffs prevail on their breach of contract claim, any diminution in property value may be an appropriate measure of damages.  However, because IDEM has yet to provide any direction with respect to an approved or required remediation plan, such costs may defy reasonable calculation.  We caution that an award of the costs of clean-up would likely cancel out any award for diminished value.

Injunctive relief as a remedy seems inappropriate since money damages would cure the problems of which Plaintiffs complain.  However, the Wickenses appropriately point out that, in *Shell Oil Co. v. Meyer*, 705 N.E.2d 962 (Ind. 1998), the lower court's equitable powers were invoked to require payment into a fund for purposes of covering future corrective action costs.  Thus, though the likelihood that this court will impose an equitable remedy in this case is remote at best, we cannot say for a certainty that it will not occur.

There is no authority entitling Plaintiffs to receive as damages an award to compensate them for the personal time they devoted to this matter; similarly, there is no legal basis for an award of punitive damages in this case. Throughout their briefing, the Wickenses have attempted to portray Shell as an arrogant corporation bent on ignoring their requests or delaying responses and engaging in other forms of uncooperative behavior.  Indeed, while Shell could

no doubt have been more prompt and forthcoming in responding to Plaintiffs'
various inquiries and requests, Shell perhaps was justified in taking a more
cautious approach to Plaintiffs' demands since what Plaintiffs sought was that
Shell take over full and complete responsibility for cleaning up the
contamination on property which Shell had not owned for half a century and
for which few, if any, records were available to substantiate Shell's liability.
There is no authority for assessing exemplary damages, pursuant to Ind. Code
§ 13-23-13-8, nor is there any evidence here of independently actionable
conduct warranting an award of punitive damages in connection with a breach
of contract claim.  *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608
N.E.2d 975, 984 (Ind. 1993).

Attorney fees are authorized under Ind. Code § 13-23-13-8 and may be
recoverable by Plaintiffs as a form of damages.

### *Additional Pending Motions*

Lastly, we address several additional pending motions in an effort to
move this case a few steps closer to a final resolution.  Two pending motions to
strike have been filed by Plaintiffs:  The first asks the Court to strike what
Plaintiffs describe as an independent expert report proffered by Shell and
prepared by an undisclosed expert, Dr. Allen Uhler.  In actuality, the report
Plaintiffs refer to is a summary of forensic data collected from the site which a

disclosed defense expert witness, William Hall, relied upon in rendering his opinions.  Mr. Hall is entitled to rely on the summary of data and Plaintiffs will have a full opportunity to question him regarding that reliance and any assumptions he has made regarding the validity of the data summary.  While Shell would not be entitled to call Dr. Uhler as an expert witness, Plaintiffs are entitled to depose him nonetheless with regard to his report.  We will not strike the Uhler report.

The second motion to strike filed by Plaintiffs asks the court to strike the report of a property appraiser, Michael Kelly, retained by Shell.  That report was filed several weeks prior to a subsequently vacated trial date.  The gist of the motion to strike is that the timing of the report and its disclosure to Plaintiffs prejudiced the Plaintiffs by requiring them to take Mr. Kelly's deposition at a time when trial preparations were underway by counsel.  Shell agreed to make Mr. Kelly available at Plaintiffs' convenience.  Thereafter, Shell filed its own motions in limine addressing the Plaintiffs' late disclosure of certain appraisal witnesses.  Because the earlier trial date has been vacated and is therefore no longer relevant, all motions (to strike and in limine) are denied, Plaintiffs and Shell's alike.

Also pending are Plaintiffs' fourth and fifth motions to compel.  However, Plaintiffs have not established compliance with the provisions of Local Rule 37.1 requiring counsel who makes any motion relative to discovery to file a

contemporaneous statement reciting efforts to resolve the issues raised in the motion with opposing counsel, including specification of dates and places of any conferences or meetings.  Local Rule 37.1 provides that the Court may deny a motion that has been filed without such a contemporaneous certification.  A quick review of the Defendants' responses to these two motions discloses that most of what is being sought was either in the process of being produced at the time the motions were filed or was available to Plaintiffs in free, publicly available data sites.  Thus, we deny the motions due to Plaintiffs' failure to comply with the Local Rules, but without prejudice to reconsideration of any of the issues, if disclosure remains disputed.

As mentioned previously, Shell filed three motions in limine immediately prior to the trial date, which calendar setting was thereafter vacated.  Since there was no reply to any of those motions, our ruling is stayed until new deadlines for such motions and responses has expired.

After the court vacated the earlier trial date, Plaintiffs filed a motion to continue any additional trial-related deadlines and sought the establishment of new deadlines.  That motion is well taken and new deadlines are now provided as follows:

Trial Date - Monday, January 22, 2007 - 9:30 a.m.

Final Pretrial Conference - Tuesday, January 9, 2007.

Deadlines set forth in the initial approved Case Management Plan, (Document #22), as "two weeks before final pretrial conference" will now be December 15, 2006, to accommodate the holidays.  And, for the same reason, deadlines originally set forth as "one week before final pretrial conference" will now be December 22, 2006.

Any motions to preclude expert testimony must be filed or, renewed if previously filed, by November 28, 2006, and responses to such motions must be filed by December 22, 2006.

Finally, Plaintiffs have moved for leave to file three supplemental exhibits in support of their response to Shell's arguments that no corrective action is needed on the site and that Indiana's statutory scheme applies only to "regulated units."  In light of our prior rulings, we deny this request as moot.

### ***Conclusion***

Plaintiffs' Motion for Partial Summary Judgment (Document #92) is DENIED.  Defendants' Motion for Summary Judgment is GRANTED IN PART, specifically as to Counts III, IV, V, VI, VII and IX; however, the motion is DENIED as to Counts I and VIII.

Plaintiffs' Motion to Strike the 30-Page Uhler Report (Document #105), Motion to Strike the 72-page Kelly Report (Document #115), Fourth Motion to Compel (Document # 116) and Fifth Motion to Compel (Document # 140) are all DENIED.

-29-

Plaintiffs' Motion to continue and reset Trial-Related Deadlines (Document #138) is GRANTED and the deadlines set forth in this order are now in full force and effect.

Further, the parties and their counsel are ordered to prepare for and attend a settlement conference before Magistrate Judge John Paul Godich in Room #355 of the U.S. Courthouse in Indianapolis at 10:00 a.m. on Tuesday November 21, 2006.

IT IS SO ORDERED   11/09/2006

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Harry Nicholas Arger
DYKEMA GOSSETT ROOKS PITTS PLLC
harger@dykema.com

Gregory P. Cafouros
KROGER GARDIS & REGAS, LLP
gpc@kgrlaw.com

Lee T. Hettinger
DYKEMA GOSSETT ROOKS PITTS PLLC
lhettinger@dykema.com

Miriam A. Rich
GONZALEZ SAGGIO & HARLAN, LLP
richm@gshllp.com

Mark Eliot Shere
ms@sherelaw.com

Rosa Maria Tumialan
DYKEMA GOSSETT ROOKS PITTS PLLC
rtumialan@dykema.com

Jeffery Alan Whitney
GONZALEZ SAGGIO & HARLAN LLP
jeff_whitney@gshllp.com

-30-