**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **DANIEL J. WICKENS and PAMELA M.** ) **WICKENS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **1:05-CV-645-SEB-JPG** |
| **vs.** ) | |
| ) | |
| **SHELL OIL COMPANY and SHELL** ) **OIL PRODUCTS COMPANY, LLC.,** ) | |
| ) | |
| **Defendants.** ) | |

**ENTRY ON PLAINTIFFS' PETITION  FOR ATTORNEY FEES
AND CORRECTIVE ACTION COSTS**

On July 9, 2004, contractors with the City of Anderson were digging near

the sidewalk adjacent to commercial property owned by Plaintiffs, Daniel and

Pamela Wickens (the Wickenses), when soil contaminated with hydrocarbons

was discovered at a depth of about ten feet.  The Wickenses retained

HydroTech, a local environmental contractor with expertise in identifying

sources of contamination, to determine the nature and source of the

contamination.  After an initial investigation, including three soil borings on

the Wickens property, HydroTech concluded that the petroleum contamination

was likely the result of a release from an underground gasoline storage tank.

After advising Mr. Wickens of state law notification requirements, HydroTech

reported its findings regarding the petroleum release to the Indiana

Department of Environmental Management (IDEM) on July 27, 2004.

The discovery of petroleum contamination on the Wickens property was not entirely surprising, given that the property had previously been a Shell Oil gasoline filling station prior to its purchase by the Wickens family in 1953. After discontinuation of the filling station, the underground storage tank which had held the gasoline was abandoned and never removed from the site.  In addition, the property across the street from the Wickens property had also once been the site of another gasoline filling station operated by Gulf Oil.  That property was, and still is, owned by Richard Gardner; he is no longer a party to this litigation.

***Regulation of Underground Storage Tanks***

Article 23 of Title 13 of the Indiana Code sets out the provisions of the State's Underground Storage Tank Act (USTA), which includes a regulatory structure for dealing with any release from any underground storage tank (UST).  Consistent with virtually all other states' statutes of this sort, Indiana law also includes "corrective action" provisions for storage tanks which have been found to have leaked in the past or are leaking currently.  The USTA vests the Commissioner of IDEM with authority to require that corrective action be taken with regard to the release of any regulated substance from a UST.  Ind. Code § 13-23-13-1.  The owner of the property on which a UST is located can

2

be required to personally remediate a release or to pay the costs of emergency corrective action undertaken by the State. Ind. Code § 13-23-13-8(a).  However, in contrast to most other states, Indiana has not limited the ability to seek corrective action costs for a leaking UST only to the State's environmental management agency.  Anyone who, acting voluntarily or at the state's behest, "undertakes corrective action resulting from a release from an underground storage tank" (Ind. Code § 13-23-13-8(b)(2)) can seek to recover for corrective action costs and attorney fees.  The statute further provides:  "In resolving a contribution claim, a court may allocate the cost of a corrective action among the parties to the action using equitable factors that the court determines are appropriate."  Ind. Code § 13-23-13-8(b).

**The Pending Legal Issue**

The parties successfully negotiated a settlement of the merits of this litigation.  The petition now before us is based on the provisions of the USTA by which the Wickenses seek to recover attorney fees as well as reimbursement of costs incurred in connection with the environmental corrective action resulting from an environmental investigation into the cause and scope of the petroleum contamination that was first discovered by the city workers.  The petition also seeks repayment of the costs and fees incurred by Plaintiffs in prosecuting this action or claimed to have been necessary to pursue their claim under Ind. Code. § 13-23-13-8.  The dispute over repayment of these costs and fees is the

3

remaining vestige of the parties' protracted settlement negotiations which were successful in all but this one respect.  In settlement of this case, Shell has agreed to purchase the Wickens property, pay to the Wickenses certain damages and assume responsibility for the clean-up of the property and for coordinating with IDEM on the clean-up process.  The amount of corrective action costs and attorney fees Plaintiffs should recover pursuant to the Indiana statutes remains unresolved.  For purposes of settlement and to allow the Court to focus its attention on resolving the amount of fees and costs recoverable by Plaintiffs, the parties stipulate that Daniel and Pamela Wickens brought a "successful action" as referenced in Ind. Code § 13-23-13-8(b).

### *Factual Background and Procedural History*

The extensive detail required by the Court to recount the tortuous, protracted journey of this litigation is almost as difficult and frustrating as it was to live through it as all as the dispute unfolded month after month, year after year.  We shall begin at the very beginning, to borrow the well-known lyrics of Oscar Hammerstein.

Plaintiffs are the most recent in a line of proprietors of a family-owned shoe business (including shoe repairs) located on the site of the former Shell gasoline station.  At the time the contamination was discovered in July of 2004 and further identified by Hydrotech as a dated petroleum product release, the

Wickenses were closing their business and attempting to sell the property and retire.  After discovering the contamination, the Wickenses proceeded with the closure of their store but were unable to sell the property (hereinafter "the Wickens property).  They had listed the property for sale at a total purchase price of $139,900.00.

Following discovery of the contamination, on August 2, 2004, Cory Smith of HydroTech contacted Mark Shere, an attorney with whom Smith and HydroTech had worked previously, to indicate that he (Smith) had a client who might need legal assistance.  Smith put Shere in touch with Dan Wickens.  The next day, August 3, 2004, in response to the report of the petroleum contamination on the Wickens property property, IDEM sent a letter to Mr. Wickens assigning an agency site number to the location and outlining the Wickenses' obligations as owner of property where a petroleum release was reported, including a directive to assemble further investigative information relative to the size and nature of the release.  The Wickenses retained Shere to represent them in connection with resolving the legal issues relating to the contaminated property and also authorized HydroTech to engage in further soil and groundwater flow investigation.  Shere agreed to represent the Wickenses on a contingency basis, subsequent to payment by them of an initial $1,000.00 retainer.  Shere's fees were to be paid out of what he could recover for the Wickenses both in terms of damages and attorney fees.  Contrary to Rule 1.5(c)

of the Indiana Rules of Professional Conduct, that agreement between Shere and the Wickenses was never reduced to writing.

Now four years later, the property has yet to be completely cleaned up, and the legal journey has been circuitous, arduous and acrimonious.  Among other things, in a questionable maneuver, HydroTech and Shere expanded their investigation *sua sponte* into the source and scope of the contamination to include the Gardner property through additional soil borings by HydroTech on that adjoining (or at least nearby) property.  The results from the borings and two monitor wells which HydroTech had installed on the Gardner property were provided to IDEM in September of 2004 as a part of HydroTech's initial investigation of the Wickens property.[1]  Meanwhile, Shere contacted Donn Wray, an attorney in Indianapolis whom Shere had known to represent Shell in the past.  Shere advised Wray of the situation the Wickenses were facing and

_____

[1]Cory Smith of Hydrotech testified at a hearing before the Court on May 12, 2008, stating that he was not asked by Mr. Wickens or IDEM to test the Gardner property but thought it wise to do so in order to determine if contamination might be coming from the Gardner property onto the Wickens property.  According to Smith, he received permission to do so from "Mrs. Gardner" while he was already on the Gardner property.  That she gave her permission seems curious to us, assuming Mrs. Gardner was correctly informed of the reason Smith desired to drill on the Gardner property.  If Smith was looking to show that contamination originating from the Gardner property was flowing toward the Wickens property, and fully explained that to the Gardners, it would not have been in the Gardner's best interest to have allowed the testing. Further, as it turned out, Smith's decision to test soil and groundwater to the north of the Wickens site by drilling directly on the Gardner property, rather than somewhere in the right of way between the two properties, wound up putting his client in a worse position because, after it received the results from the Gardner property testing, IDEM required the Wickenses to pursue further investigation of environmental conditions related to the Gardner property as well as their own.

that the property had originally been sold to the Wickens family by Shell.  In a letter dated October 6, 2004, Shere provided Wray with a copy of the 1953 deed from Shell to the Wickenses and a copy of HydroTech's initial investigative report covering the Wickens property as well as the borings from the Gardner property, noting that groundwater flow indicated the contamination likely went from the Wickens property to the Gardner property.

Wray apparently told Shere he would pass the information along to someone at Shell, but beyond that it is clear that very little, if anything, was done to initiate discussions between the parties until early 2005.  In addition, the Wickenses' deed was never delivered to an appropriately responsible official at Shell.[2]  Following HydroTech's receipt of the initial investigative report in September of 2004, IDEM sent Mr. Wickens a letter dated November 18, 2004, setting forth the details of the further investigation required by him regarding both his property and the "former gas station located across 23rd street" (a reference to the Gardner property).

On January 11, 2005, Wray sent an e-mail to Shell's in-house legal department reminding them that Shere was seeking the name of a contact

---

[2]It is unclear why Shere assumed Wray was the proper person to contact concerning his clients' claim against Shell.  Further, we have been left in the dark regarding the context of any interaction between Wray with Shell during the course of this dispute.  Wray never filed an appearance in this lawsuit on behalf of Shell, though e-mail correspondence between Shell personnel confirms that at the time he first contacted the company about the   property Shell considered Wray to be one of its outside counsel.

person at Shell to discuss his client's claim.  Because of the substantial

number of filling stations which Shell has owned over the years and the

plethora of environmental problems which stem from leaking underground

storage tanks, Shell has created a separate department to deal specifically with

environmental claims arising from their ownership or operation of filling

stations.  The day after Wray's email arrived at Shell (on January 12, 2005),

Senior Litigation Counsel, Cisselon Nichols, called Shere to obtain the address

of his client's property and to assure that she would follow-up with him.

Shell's claims department then conducted a record search but could turn up

no record indicating that it had ever owned a filling station at the address of

the Wickens property.  Thus, two days later, Shere received a phone message

from a representative at Shell who stated that, in making his claim against

Shell, Shere was "barking up the wrong tree."

Irritated by both the tone and the content of this phone message, Shere

telephoned Wray to obtain contact information for Ms. Nichols at Shell.

Following their phone conference, Shere e-mailed to her a copy of the deed

transferring the property from Shell to the Wickenses.  Later in January 2005,

Beth Reeves, another employee in Shell's claims department, had further

conversations with Shere as well as with Chris Meyers of IDEM, from which

Shell first learned that the environmental investigation initiated by IDEM

included the property across the street from the Wickens property, which was

also formerly used as a gas station.  In hindsight, it seems, the expansion of

the claimed contamination to include the Gardner property, including IDEM's

request that the Wickenses include investigation of that contamination as well,

squelched any interest or effort on the part of Shell to promptly assume

responsibility for the investigation and any resultant remediation efforts.

Though it possessed no record confirming its prior ownership of the

Wickens property, Shell did have incontrovertible evidence of its sale of the

property to the Wickens family and the prior use of that property as a gas

station.  After receiving a copy of the deed, Shell's decision as to how best to

proceed was nonetheless complicated by the fact that IDEM was requiring that

the site investigation include the Gardner property on which another filling

station had been located but which neither the Wickenses nor Shell ever

owned.  Thus, in February, Reeves informed Shere that Shell required

additional information relating to the property located across the street from

the Wickens property to assure that it was not a contributor to the

contamination at the Wickenses' site.  Shere requested the address of the

property and the name of the owner as well as any environmental consultant

reports regarding ground water flow or the contamination found there.  In a

March 10, 2005, telephone call, Reeves was told by Shere that HydroTech had

determined that evidence of the groundwater flow supported a conclusion that

the contamination flowed from the Wickens property in the direction of the

property across the street and that Shere would follow-up with a letter to this effect in an effort to address Shell's concerns.

Shere's follow-up letter, dated March 10, 2005, exacerbated the tensions between the parties. He unilaterally set a deadline of March 23, 2005, for Shell to meet the Wickenses' demand that it assume responsibility for responding to IDEM's letter of November 18, 2004, and pay all legal and investigative fees and expenses (estimated at just under $20,000) incurred to date. Shere further indicated in his letter that a civil suit seeking considerably more in damages would be filed if his deadline was not met. He did provide Shell with the address of the Gardner property and, despite the fact that by that time the Wickenses' consultant, Hydrotech, had apparently met with Mrs. Gardner on more than one occasion, including having secured her permission to drill on the property, Shere represented in his letter to Shell that the Wickenses do not know who owns the property. While acknowledging that he can not provide Shell with "exhaustive or conclusive information," Shere closes his letter by stating that the information he has provided Shell makes it very likely that Shell "contributed to gasoline contamination at the Wickens property and very unlikely that Mr. Wickens' shoe store did so."

With Shere's self-imposed deadline and threats, and with substantially less than "conclusive" information to support the contamination claims and allegations of responsibility for it, Shell not surprisingly chose to respond to the

Wickenses' demand that it assume responsibility for replying to IDEM and that it pay the Wichenses' expenses by denying liability.  In a letter dated March 18, 2004, William Platt, the Senior Manager of Environmental Claims for Shell, informed Shere that Shell did not have enough information establishing its liability to assume responsibility for complying with the terms of IDEM's November 2004 letter.  The issues raised by Shell in the Platt letter included the fact that the Wickenses had kept two above-ground heating oil tanks on their property and the fact of higher concentrations of certain contaminants having been found on the property across the street at the Gardner property, as opposed to the Wickens property.  Platt summarized Shell's concerns as follows:

> It is unclear why a preliminary environmental investigation at a property last used as a service station more than 50 years ago would include an unnecessary assessment of an adjacent property which was most recently used as a service station by an unknown operator.  IDEM now requests that additional investigation be conducted primarily as a result of the environmental conditions discovered on another station property.

> For these reasons, Shell respectfully denies your request that it perform work related to that property as required by IDEM's November 18, 2004 letter.  Should IDEM bifurcate this investigation into inquiries related to the individual properties, please let us know.

Hindsight again suggests that, while its position as outlined in the Platt letter may have seemed reasonable at the time, Shell's response generated unintended consequences and unfortunately provided a turning point in the efforts to resolve this dispute because, from that point forward, Shell found

11

itself aiming at a moving target in terms of a possible resolution that seemed to constantly change in shape and grow in costs over which Shell had no control.

On March 24, 2005, Shere filed suit as he had threatened to do on behalf of Daniel and Pamela Wickens in Indiana state court, asserting multiple theories of entitlement to recovery. The record does not reveal the precise date on which Shere agreed to pay for HydroTech's work from March 2005 forward, but he did. Prior to that, HydroTech and Dan Wickens had entered into individual contracts covering the two stages of work to be performed by HydroTech. But, thereafter, again no written contract between Shere and HydroTech was entered into nor was anything reduced to writing that set out the price or scope of the work to be performed by HydroTech. As indicated previously, Shere also had no written engagement letter with the Wickenses, even though, as he and Cory Smith both admitted in testimony during the May 12, 2008, hearing, the litigation strategies as well as the remediation efforts (including interaction with IDEM) were determined entirely by Shere and HydroTech acting alone.

Shell removed this case to our Court in May 2005 and added a third party complaint against Richard Gardner, based on his ownership of the adjoining/nearby property. Gardner later filed a fourth party complaint against Chevron USA, Inc., as successor in interest to Gulf Oil, which had operated the filling station previously located on the Gardner property. At the

initial pretrial conference held before a Magistrate Judge of our court on July
13, 2005, Shell outlined its position, committing to remediate the Wickens
property and respond to IDEM, but refusing to take responsibility for
remediation of the Gardner property.  Shell asserted then and continued to
assert that these claims should be bifurcated as should the underlying
environmental investigations.

In July of 2005, Shell also proposed a standstill agreement in order to
determine if all the parties could agree on where the contamination was coming
from.  Shell sought access to the contaminated sites to have its own
environmental consultants assess the situation.  Shell further proposed that
Plaintiffs dismiss the suit without prejudice, retaining the right to refile if
necessary (with Shell agreeing not to raise any statute of limitations defense)
depending on the findings from the environmental tests.  However, even as the
parties attempted to negotiate the standstill arrangement, the Wickenses
continued to demand that Shell pay them their lost rental value and other
damages, which entitlements had never been asserted previously by Plaintiffs
in the initial settlement discussions.  Shere also requested that Shell pay ever
increasing amounts of attorney fees, rising with each exchange of
communications.  In short, Plaintiffs' demands in conjunction with the
standstill agreement increased from less than $20,000 in March of 2005, to
more than $64,000 by August 2005.  In addition to constantly upping the ante

with no apparent end in sight, Plaintiffs apparently believed they had Shell over a barrell (so to speak) and could get whatever they asked from them.

Unfortunately for Shell, it failed in its efforts to gain access to the clean-up site. Without an ability to confirm for itself the source of the contamination, Shell's choices were few: it could either capitulate to the demands of Plaintiffs in return for the requested standstill agreement or allow the litigation to forge ahead and assert its right to independently investigate the property through the court-supervised discovery process. Thus, the litigation moved forward and the parties dug in even deeper for what ultimately proved to be a lengthy, costly and divisive battle. Only after the Magistrate Judge intervened to broker an arrangement during the contentious discovery process did Shell finally succeed in gaining access to the site to allow its environmental consultant to do independent testing. In December 2005 and January 2006, NESA, the environmental firm retained by Shell, took soil borings and measurements while HydroTech, through Shere, insisted on being present at the scene engaging in splitting samples and duplicating NESA's investigative steps.

Shell directed NESA to submit a copy of its report and findings from the site investigation to IDEM. On March 23, 2006, IDEM responded to Shell by letter, with copies to Mr. Wickens, Mr. Shere and the attorney for Shell, reporting on its review of the September 3, 2004, preliminary investigation report provided by Hyrdrotech as well as the March 1, 2006 report submitted

14

by NESA.  Following its review, IDEM concluded that additional investigation was necessary to determine more fully the nature and extent of the contamination.  The IDEM letter also offered general comments relating to the necessity of a plan for further work at the site and specific comments with respect to the past and future testing methodology employed.  In conclusion, IDEM directed that a work plan be prepared and submitted for further sampling at the site.  Shell's attorney responded to IDEM by letter dated May 11, 2006, addressing several of the specific comments made by IDEM in its letter and offering the opinion that many of IDEM's requests for further testing seemed to it to be unnecessary.

At this point, our saga takes another unanticipated turn.  HydroTech obtained a copy of the letter from Shell to IDEM and, in response, Cory Smith/HyrdoTech wrote his own unsolicited letter to IDEM to rebut Shell's assertions.  It is, of course, not at all unusual for experts engaged to assist particular litigants in a civil lawsuit to have differences of opinion, much as NESA and HydroTech clearly did with regard to a number of issues relating to the nature and extend of contamination at the Wickens and Gardner properties.  What is highly unusual, however, is for an expert consultant, such as HydroTech, who had been retained to assist the Wickenses in resolving any issues regarding contamination on their property, to contact the state agency with oversight and regulatory responsibilities to argue *sua sponte* in favor of

15

more remediation efforts, rather than fewer.  That was clearly the effect of Smith's letter to IDEM in which he argued for more ground water sampling and urged IDEM to require a survey of potentially impacted water wells as well.

Sadly, the parties' attorneys grew more truculent and their communications more stubbornly combative.  They became embroiled in one discovery controversy after another, essentially rendering the remainder of 2006 a time of minimal progress, both in terms of litigating this lawsuit and in terms of cleaning up the contamination site.  In July, IDEM responded to the May 11, 2006, letter from Shell's attorney, essentially rejecting most of the suggestions and reasoning by Shell and asserting that the full scope of its recommended additional investigation measures required attention by the parties because both the NESA and Hydrotech reports were insufficient in terms of determining the scope of the contamination problem.  Shell responded to IDEM in an August 21, 2006, letter which included a proposed work plan and provided further clarification of the points it had raised in its earlier letter to IDEM.

In an e-mail to Shell's attorney on November 3, 2006, from Amy Berg, who was then the IDEM project manager for the contamination site, Shell was informed that IDEM had decided that from that time forward it would respond only to Mr. Wickens with regard to the site.  As explained in the e-mail, Berg's supervisors and the agency's attorneys decided that because the Wickenses

16

still owned the property, only the Wickenses could decide who IDEM should correspond with in formulating future plans at the site.  By this time, clearly, the clean-up of the site had become the tail of the litigation dog and, since all the decision-making with regard to the nature and extent of timing of the clean-up was completely in the hands of the Wichenses' attorney and their environmental consultant, all of whose fees would necessarily have to be paid by Shell, assuming Plaintiffs' success in their litigation, there was no effective way for Shell to staunch the financial flow.  The Wickenses, of course, had no financial obligation to Shere, and Shere had begun assuming personal responsibility for any and all expenses incurred in connection with HydroTech's work at the site.  The only financial interest which the Wickenses retained at this point was from the sale of the property which they hoped to do so that they could move on to retirement.

At about this same time, the likelihood of the Plaintiffs' litigation success became nearly 100% certain.  On November 9, 2006, the Court entered an order denying Shell's motion for summary judgment with respect to the Wickenses' claim for corrective action costs and their contractual breach claim.[3]  In that order, we also addressed the Wickenses' claim for corrective

---

[3]We allowed the Wickenses' contractual claim to survive, exercising perhaps an over abundance of caution with regard to potential duties Shell might have assumed through the terms of any sale agreement it had with the Wickens family members.  Only a copy of the deed had been found at that point in the litigation and, as it turns out, no written sales contract for the transfer of the real estate was ever discovered and no evidence of any other terms of agreement

action costs under Indiana's UST statutes, concluding that:

> In summary, while it is clear from the evidence that Shell bears
> some responsibility for gasoline contamination on the site, we can
> not conclude that it is responsible for 100 per cent of that
> contamination. Shell has pursued a third-party claim against the
> owner of a nearby property which also utilized a UST in
> conjunction with its operation of a gasoline filling station. While
> the likelihood that contaminants from that property flowed in a
> direction opposite to the natural groundwater flow between the
> properties is remote, it remains a possibility. A scintilla is not easy
> to measure, but we know it isn't very much.  Accordingly, Shell has
> provided the required scintilla of evidence to avoid a determination
> on summary judgment that it is 100 per cent liable for any
> petroleum contamination which otherwise must be covered by the
> Wickenses.

On the basis of our November 2006 ruling, Shell would have understood
that it was facing liability for the lion's share, if not all, of the corrective action
costs associated with the clean-up of the Wickens property and, accordingly,
would be required to pay the reasonable attorney fees that had been incurred
in prosecuting the action under Ind. Code § 13-23-13-1.  The Wickenses, Shere
and HydroTech all knew this as well.  The settlement value of the case
skyrocketed with that ruling, and any incentive on the part of Plaintiffs to settle
surely decreased, at least with respect to the interests of Shere and HydroTech.
So long as the litigation continued and the Wickenses retained ownership of
the real estate, Shere and Hydrotech controlled any and all responses to the
IDEM-directed investigation and remediation and could elect to continue to

---

between the Wickenses and Shell was made of record.

incur, or generate, costs that, under the USTA, would be on Shell's dime. The only way for Shell to successfully combat these hemorrhaging costs was to offer to purchase the property, which Shell eventually did in the course of settlement discussions conducted by the Magistrate Judge.

In a November 30, 2006, e-mail to Shell, Shere summarized his understanding of the status of the settlement negotiations as of that time, as follows:

> My understanding is that, at the end of the mediation session last week, Shell was willing to pay 100% of the past and future corrective action costs at the Wickens property; to indemnify the Wickens and any future owners or tenants of the property against these costs (and, presumably, against any third-party claims from the Gardners or others), and to pay reasonable costs of litigation as determined by the Court. Shell based this offer on its ability to have the corrective action work performed by its own consultants.

> As we discussed this morning, Dan and Pam Wickens are willing to accept this offer, with two changes. First, Shell will include in the settlement a payment to the Wickens of $35,000. Second, Shell will pay the full legal and corrective action costs through the date of final settlement, without submittal of those costs to the court. These costs total about $425,000. The rough breakdown of these costs is 1360 hours of legal work since September 2004 at $265 per hour (about $360,000), about $40,000 in HydroTech costs (corrective action and litigation support, combined), and another $25,000 for all other experts, transcripts, travel, Lexis, copying, and so on. I've tried to build another week of intense trial preparation into this figure, so the amount will not need to increase if we can settle by the end of next week.

Shell did not accept Shere's proposed changes to its settlement offer because of what it viewed as excessive attorney fees.

Rule 68 of the Federal Rules of Civil Procedure allows a party defending against a claim to offer to have a judgment taken against it for a particular sum of money.  If the offer is not accepted and the actual judgment finally obtained is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.  Fed. R. Civ. P. 68.  On December 12, 2006, Shell served and filed an offer of judgment under Rule 68.  The amount of the offer was $279,900 and, as delineated by Shell, it represented: $139,900 to purchase the Wickens property at the full listed price; $40,000 to cover the corrective action costs incurred to date as estimated by the Plaintiffs; and the remainder to cover Shere's attorney fees.  Shere quickly responded by letter, pointing out that the offer was ineffective as an Offer of Judgment because Shell could not legally condition an offer on the sale of property and that the document was also improperly filed with the Court given that Rule 68 requires filing of the offer only if it is accepted.

In terms of the Rule 68 procedure, Shere was correct in asserting that it does not permit ons to be placed on offers.  Nor was there a basis in law for Shell to force the sale of the property.  Beyond that, what became abundantly clear at that point was that the litigation was being driven almost exclusively by the ever-increasing amount of attorney fees that Shere could recover, rather than by whether Shell would assume responsibility for remediation of the property.  Because of the contingent nature of the undocumented fee

arrangement between the Wickenses and Shere, the amount of the attorney fees to be paid in a settlement had virtually no impact personally on the Wickenses.  They could receive the full value for their property and reimbursement of any of their out-of-pocket costs paid to HydroTech or others if they accepted the offer or variants thereof being proposed by Shell as of the end of 2006.  Only attorney fees stood in the way of a final, global resolution.

On January 9, 2007, the Court conducted what had been scheduled as a final pretrial conference, during which, due to the lack of progress with the IDEM investigative directives outlined in its November 3, 2006, letter, it became clear that the case was not ready for trial.  The Court expressed its concern that the docket reflected a substantial number of filings and pending discovery disputes which, among other things, were contributing to runaway attorney fees that were impeding, if not preventing altogether, a negotiated resolution of the lawsuit, never mind the ultimate goal of the litigation, namely, to effect a prompt clean-up of the affected properties.  Accordingly, an order was entered by the Court which directed the parties to confer in an effort to agree upon an independent consultant to conduct tests and submit a report to IDEM in response to the agency's November 3rd directives, on the assumption that the only thing standing in the way of a resolution of this case, through either trial or settlement, was a determination of what, if any, sources other than Shell's UST contributed to the soil contamination.  The Order also instructed the

parties to cooperate in taking whatever steps were necessary to obtain a prompt response from IDEM to their jointly submitted report.  Plaintiffs were to file a status report with the Court in April providing notice of any action(s) taken in response to the Court's directives.  The trial was set off and rulings on all pending motions and case management deadlines were stayed.  The Court also ordered that:  "No party shall be responsible for the attorneys' and expert fees incurred by any other party between the date of January 10, 2007, and the date that the parties' report due to be filed with this Court on or before April 11, 2007, is, in fact, filed with this Court."

The intent of that order was to impose a stop on litigation activities in order to foster a climate where an independent environmental consultant could weigh in and hopefully break the impasse created by the face-off between the two retained experts and thereby hopefully open the way to a resolution short of trial.  In particular, the Court sought to curtail further increases in attorney fees.  If no settlement could be achieved, it was thought at least the issues would be better defined by the independent consultant's input and clarified by him more neutral opinions.  In addition, it was hoped that IDEM's response would be forthcoming by the time of trial.  Shere filed an objection to our order, captioning it an "Emergency Motion to Clarify and Reconsider," in which he contended that there was no way that the parties could agree on an independent expert consultant and, further, that the Wickenses could not

afford to pay HydroTech to match the work of NESA, if they were required to prepare and submit a joint response to the IDEM letter (which was an alternative we had included in our order if the parties were unable to agree upon or secure the services of an independent consultant, given the short notice). Shere also strenuously objected to our prohibition against incurring additional, arguably, recoverable attorney fees during the three month period required for the exchange of reports and communications with IDEM. According to Shere, to rule out recovery of attorney fees and expenses during this time period would give Shell a distinct advantage due to its financial superiority and, in any event, was not consistent with the statutory intent governing these lawsuits. Shere insisted that the Wickenses, as owners of the property, were permitted under controlling Indiana statutes to recover for whatever expenses were necessary to clean-up the property and prosecute their litigation, including fees and costs, regardless of when or how they might be incurred.

We denied the Wickenses' emergency motion, reiterating our concerns over the run away costs and attorney fees, though we also indicated we would not rule out the possibility of a recovery by Plaintiffs for their attorney's or consultant's work during this time period upon a showing of extremely good cause and clear necessity. This seemed to the Court to be entirely reasonable since the hiatus was limited to a mere a 90 days. Whatever Shell's attorneys or

experts might decide to do at their own expense during those 90 days was not going to put the Wickenses in jeopardy of any real prejudice, and the time period was geared to the amount of time necessary for the parties to engage a neutral consultant and have him/her fairly assess the situation.  Shell had already agreed to pay the fees of any neutral consultant, further limiting any additional costs to the Wickenses.  Finally, we gave short shrift to Plaintiffs' claim that it would be impossible for the parties to agree on an independent expert, perceiving Shere's objection to be one more demonstration of the attorneys' lack of cooperation; the Court noted in overruling Shere's objections that agreements by counsel on neutral consultants are routine in many types of litigation and should be regarded as such in this case.  Indeed, the parties ultimately proved the Court correct when they eventually were able to agree on an independent environmental consultant.

The independent environmental consulting company when the parties chose to do the testing and respond to the IDEM letter of November 3, 2006 was August Mack.  Unfortunately, however, the selection of a neutral consultant did not stop either side from incurring additional costs, give that each assigned its own expert to looked over August Mack's shoulder when August Mack performed its tests.  Of course, the Wickenses include recovery of those costs and fees in their petition for reimbursement.  The Wickenses also filed a status report with the Court following the the 90-day hiatus, providing a

copy of IDEM's response to the August Mack report which directed that further investigation be completed.  Shere also criticized Shell for its response to the IDEM letter describing it as an attempt by Shell to convince IDEM to reduce the level of the clean-up standards from residential to commercial; Shell, in turn, accused Plaintiffs of unilaterally providing August Mack with voluminous materials in support of their position regarding the source and flow of the contamination.  The Wickenses have not taken issue with any of IDEM's recommendations and have indicated their intent to comply with the latest requests by IDEM for further investigative work.  We entered another order on April 18, 2007, once again castigating the attorneys for their continued refusals to cooperate with one another and their demonstrated intent to impede progress of this case to a final resolution.  The matter was set for trial in November 2007.

The Magistrate Judge convened additional meetings between the parties to conduct settlement negotiations despite their ongoing recalcitrance and continued contentiousness over further environmental clean-up investigations at the site.  Significant progress in settlement negotiations was reportedly made during June and early July of 2007.  However, the terms of the settlement proposals continued to shift with HydroTech and Shere continuing to mount up fees in connection with the remediation work at the site and in preparing for trial.  On July 18, 2007, with settlement discussion bringing the parties closer

25

than they had ever been before, the Magistrate Judge entered an order prohibiting further corrective action at the site unless agreed to by the parties or ordered by the Court, and on August 23, 2007, the parties reported that they had reached a partial settlement, resolving all issues other than the amount of corrective action costs and the amount of reasonable attorney fees Plaintiffs could recover.  The terms of the settlement reached by Shere and Shell provided as follows:  Shell agreed to purchase the property for $139,900 and pay to Plaintiffs $60,100 in "property damages."  Shell also agreed to stipulate that the Wickenses had brought a "successful action," as that term is defined in Ind. Code § 13-23-13-8, and the amount of corrective action costs and reasonable attorney fees that the Wickenses and Shere are entitled to recover would be submitted to the Court for a determination.

Pursuant to the schedule set by the Court, the Wickenses moved for an award of corrective action costs and fees, and the parties briefed the relevant legal issues.  On May 12, 2008, a hearing was held and, through witness testimony and argument, the parties responded to a series of questions posed by the Court, as well as additional inquiries from the bench during the course of the hearing.  Plaintiffs seek a total recovery from Shell in excess of $860,000.00, which amount consists of the sum of corrective action costs (in the amount $186,816.16, plus interest of $18,689.84); in addition, Shere seeks attorney fees amounting to $592,283.20, plus interest of $66,808.58, or, in the

alternative, attorney fees calculated at current billing rates, which would total $656,804.20.

### *Awarding Corrective Action Costs and Attorney Fees*

As indicated previously, Ind. Code § 13-23-13-8 authorizes reliance on equitable factors as the court deems appropriate when allocating corrective action costs "in resolving a contribution claim." And, as stipulated here, the prosecution of a successful action entitles a party to attorney fees as long as the fees are reasonable. Ind. Code § 13-23-13-8(b). The key modifiers here are "equitable" and "reasonable," and our examination of the circumstances, as a whole, leaves us with a number of questions and concerns. Under the facts of this case, we must decide whether it would be equitable to allocate the entirety of the corrective action costs to Shell? In addition, we must determine whether it is reasonable to devote nearly $600,000 in attorney time to fight a large corporate entity whose pace in responding to Plaintiffs' demands seemed inexcusably lethargic. We must resolve the issue of whether all the work performed by HydroTech can be classified properly as "corrective action costs," or whether a portion of the work was performed in support of the litigation, and, indeed, whether the answer to this final question ultimately makes any difference.

### *Corrective Action Costs*

We begin our analysis by analyzing the corrective action costs.[4]  The USTA does not define "corrective action" or "corrective action costs."  However, it does state that an "exposure assessment" is included in the corrective action costs that may be recovered in an action for contribution.  Ind. Code § 13-23-13-3.  "Exposure assessment" is defined as "an assessment to determine the extent of exposure, or potential of exposure, of individuals to any regulated substance from a release from a underground storage tank ..."  Ind. Code § 13-11-2-75.  From this definition, we infer that both investigative and remedial expenses are included in the recoverable costs when seeking contribution for the clean-up of a UST leak.

But, of course, the Wickenses' site has yet to be remediated, though Shell has agreed as a part of the settlement to bear the expense of that clean up.  Nevertheless, to the extent that the work performed by HydroTech and others constituted an exposure assessment, involving processes reasonably aimed at identifying the scope and nature of the contamination, we find that those costs

---

[4]In their briefing, both sides made a practice of lumping together corrective action costs and attorney fees when discussing what Shell should or should not be required to pay.  In our opinion, these are distinct entitlements subject to their respective facts and the law.  Plaintiffs' citation to *Wolf Lake Terminals, Inc. v. Mutual Marine Insurance,* 433 F.Supp.2d 933, 954 (N.D.Ind. 2005) as authority for the proposition that "corrective action costs" include the work of an attorney is misplaced.  *Wolf Lake* was not a USTA case.  Further, the court in that case found that the legal work necessary to create a separate corporate entity to segregate a particular location within a vast facility in order to reduce the size of the actual contamination site was reasonable and saved extensive unnecessary investigative costs.  *Id.*  This is not at all similar to the Wickens property.  Plaintiffs cannot claim that any of Shere's legal work reduced or limited the amount of investigation required by IDEM.  If anything, Shere's legal work seemed always to expand the work that had to be performed by everyone else.

must ultimately be borne by Shell.  This ruling is limited to work done on the Wickens property; it specifically does not include costs associated with testing on the Gardner property.  However, our ruling today does not preclude Shell from pursuing further contribution from Chevron, if the scope of the entire area eventually requires remediation of contamination that is traced to Chevron's predecessor's UST.  Thus, for purposes of resolving the allocation or contribution issue with respect to corrective action costs in the case before us, we find that Shell bears responsibility for 100% of "corrective action costs" incurred by the Wickenses and/or their attorney.

Cory Smith of HydroTech testified by affidavit as well as in person during the hearing on this petition that HydroTech's work was performed in six stages. Stage One included the initial soil borings and testing which formed the basis of the report to IDEM of the petroleum release.  The second stage included additional borings on both the Wickens and Gardner properties and groundwater testing which generated the preliminary report filed with IDEM in September of 2004.  Stage Three involved the split sampling performed with Shell's consultant, NESA, in December 2005 and January 2006.  Though NESA and HydroTech initially disagreed on certain key groundwater elevation data, NESA later clarified an apparent misinterpretation, but not before HydroTech had engaged in additional groundwater flow measurements and soil borings in February of 2006, which comprised the fourth stage in Smith's description of

29

the HydroTech work.  Stage Five consisted of the shadowing of August Mack's work in 2007, which generated a proposed work plan by HydroTech filed with IDEM on March 20, 2007.  The sixth and final stage of HydroTech's work included the execution of their work plan, which was approved by IDEM on March 28, 2007.

With the exception of the initial ground borings and measurements taken on the Gardner property, Stages One, Two, Four and Six of HydroTech's work are essentially uncontested both as to necessity and as being a legitimate part of an IDEM-approved work plan.  Though we continue to harbor doubts about the propriety of the initial testing on the Gardner property, we shall consider the borings and ground water flow work as part of the overall process required to identify the scope of migration of any contamination and the exposure of individuals to the contamination.  Those four stages of HydroTech's work were necessary regardless of the specific person or party directing the investigation and remediation and thus constitute recoverable corrective action costs.

Stages Three and Five are distinguishable from the other four stages, however.  Both Stages Three and Five involved duplication of another consultant's work since HydroTech was merely looking over the shoulder of another consulting firm as it was conducting its tests.  The primary consultants at that point were either working for the opposing party to the litigation or were chosen by the parties to act as an independent consultant.  It

30

is immaterial to this analysis that the work performed during these stages led to the gathering of additional important information or clarified previous conflicts or otherwise contributed to necessary corrective action.  Each of these two stages of work was clearly litigation driven.  Furthermore, the Court had made clear by its order(s) that the parties were to turn off their legal and consulting fee meters for the brief 90-day period during which the independent consultant, August Mack, was performing its tests and assessments.  The work conducted in Stages Three and Five would not have been necessary were it not for the pending litigation and, if Shell is obligated to pay for that work, it is not because it was a necessary corrective action cost that had been incurred by the Wickenses.  Those amounts, if recoverable at all, would be recovered on the basis of Plaintiff's entitlement to an award of reasonable attorney fees and court costs.

Shell advances several arguments with respect to why it should not be made to pay for substantial portions of the work HydroTech performed.  First, it contends that HydroTech's procedures were inefficiently conducted in that it failed to take into account various relevant bits of information.  We are not persuaded by this argument for two reasons.  First, it is based on hindsight, which typically facilitates and clarifies any analysis.  Second, Shell's initial reluctance and delay in getting involved and in agreeing to take responsibility for remediation of the property, while perhaps justifiable to some extent at the

time, certainly involved substantial risks as well, one of which was that the investigation would not be undertaken in a manner consistent with Shell's preferred approach to the problems.  Shell's risk did not involve liability for fees or costs which were unreasonably generated by HydroTech, but it did constitute a waiver of the right to complain when otherwise reasonable options were pursued by HydroTech.

Shell also challenges Smith's testimonial descriptions and references to the six rounds or stages of work as including factual inaccuracies as well as erroneous justifications regarding the necessity of several of the stages.  On this we agree with Shell: Rounds Three and Five of HydroTech's work were conducted as litigation support rather than corrective action.  However, we do not regard Shell's arguments convincing with respect to Rounds Four or Six. HydroTech did shadow NESA in Stage Three due to the litigation, but the conflicting results in data gathering prior to NESA's corrections to its report was what prompted HydroTech to pursue the testing done during Stage Four. As for Stage Six, Shell contends that much of that work resulted from HydroTech's unreasonable criticism of August Mack's efforts and the bias in HydroTech's own work plan.  According to Shell, HydroTech's plan was much more expensive than was necessary to "obtain closure of this small site."  We share the concern that, in the latter stages of HydroTech's involvement, its intent was less the best interests of the property owner through efficient

32

resolution of a contamination issue than proving other consultants wrong, regardless of the cost involved in doing so.  However, it was HydroTech's work plan that IDEM approved, so the Court is hard pressed to conclude that HydroTech's plan and the efforts undertaken by those who were enlisted to execute it should not be financed by Shell.

Shell's other broad assertions regarding HydroTech's work and the reasons it should not be required to pay for it are simlarly unavailing. For example, Shell contends that by comparing the way in which HydroTech invoiced Shere with the way it invoiced the Wickenses clearly demonstrates that HydroTech's work was performed primarily as litigation support as opposed to remediation.  Shell argues that the purpose underlying the USTA contribution provisions would not be served if the Court were to permit an attorney and environmental consultant to recover huge fees generated in the course of trying to convince a state regulatory agency that their client's property was extensively  contaminated.  Thus, Shell contends, their offer in December 2006 of $40,000 to cover the corrective action costs, which offer was rejected by Plaintiffs, was reasonable and should be upheld without any additional corrective action costs being assessed against Shell.

Shell did not parse HydroTech's invoices to identify the particular work that they now claim was related exclusively to litigation as opposed to corrective action.  In fact, Shell offers no argument or evidence relating to any

particular invoice or entry generated during the sixth stage of HydroTech's work (which stage drew the most criticism from Shell) on the basis of which the Court could find that such work was not necessary as part of the work plan accepted by IDEM.  We shall not undertake such an analysis *sua sponte.* Though we accept Shell's assertions regarding the unreasonableness and unfairness of its being assessed the costs of HydroTech's shadowing and duplications of other consultant's work, we are not persuaded by Shell's broader arguments outlined above, including that HydroTech's invoicing methods are inconsistent with the statutory intent of the USTA.  Clearly, the circumstances underlying the case at bar do not mirror a more typical environmental remediation project.  However, we cannot conclude on that basis that corrective action undertaken by HydroTech, following the initial contamination discovery, was unnecessary or unreasonable.

Based on our determination that work performed by environmental consultants for the purpose of assisting the litigation is not properly deemed a corrective action cost, but rather must be evaluated in the context of reasonable attorney fees and court costs which may be recoverable by Plaintiffs, we have reviewed the invoices submitted by HydroTech in an effort to determine which charges constitute recoverable corrective action costs.  The volume of invoices and the hundreds of individual entries on each of the many pages of invoices made this review tedious and time-consuming.  Nevertheless,

in an effort to be as accurate as possible within realistic parameters, our review of HydroTech's invoices brings us to the conclusion that a total of $116,511.27 is recoverable by Plaintiff's as corrective action costs.  The tables below detail the invoices we reviewed, the amounts we have determined to be corrective action costs from each invoice and the reasons we reject some of the amounts billed.

| HYDROTECH INVOICES | 100% OF AMOUNT BILLED ALLOWED AS CORRECTIVE ACTION COSTS |
|---|---|
| #041252 | $  3,100.00 |
| #041268 | $     880.00 |
| #041293 | $  2,250.00 |
| #051321 | $     693.75 |
| #051352 | $     636.25 |
| #061088 | $  4,148.26 |
| #061158 | $  2,246.00 |
| #061180 | $  1,555.00 |
| #071177 | $  2,410.00 |
| #071210 | $35,226.33 |
| #071231 | $59,822.68 |

| HYDROTECH INVOICES | 100% OF AMOUNT BILLED REJECTED AS NOT CONSTITUTING CORRECTIVE ACTION COSTS | REASON FOR REJECTION (See Key Below) |
|---|---|---|
| #061015 | $     4,301.02 | 1,2 |
| #061053 | $     1,897.50 | 1,2 |
| #061401 | $     1,653.75 | 2 |
| #071021 | $     4,542.00 | 2 |
| #071105 | $     9,191.25 | 2,3,4 |
| #071122 | $     4,887.08 | 2,3,4 |
| #071451 | $     1,233.75 | 5 |

| HYDROTECH INVOICES | AMOUNT BILLED | AMOUNT ALLOWED | REASON FOR PARTIAL REJECTION (see Key Below) |
|---|---|---|---|
| #061117 | $ 3,148.00 | $ 1,273.00 | 2 |
| #061212 | $ 9,029.44 | $ 1,106.25 | 2 |
| #061335 | $    478.75 | $    203.75 | 2 |
| #061432 | $ 1,320.00 | $    960.00 | 2 |

| REJECTION KEY # | REASON FOR REJECTION |
|---|---|
| 1 | Litigation related Stage 3 shadowing and split sampling |
| 2 | Entries rejected which described activities specifically related to support of the litigation (i.e.  deposition review, affidavit preparation, deposition preparation … ) |
| 3 | Litigation related shadowing of August Mack |
| 4 | Court order was in place instructing parties that attorney fees or costs expended during this time period would not be recovered without a showing of clear necessity - which has not been made |
| 5 | Post-settlement litigation support work |

Plaintiffs have submitted invoices reflecting fees generated by two additional environmental consultants, Envision Laboratories and Bushman & Associates.  Based on the descriptions of services provided by these firms as set forth in their invoices and the fact that Shere included these consultants' charges as disbursements on his own invoices along with other litigation related expenses, we conclude that these additional consultants were retained by him in connection with this litigation and not for purposes directly related to

36

remediation.  Therefore, their invoices will be considered along with the previously identified but excluded Hydrotech billings in determining Plaintiffs' entitlement to reasonable attorney fees and court costs.  Consequently, we hold that the previously stated $116,511.27 identified from HydroTech billings is recoverable as corrective action costs.

### Attorney Fees & Court Costs

Our efforts to identify the amount of reasonable attorney fees which Plaintiffs are entitled to recover has been no less difficult and time-consuming than our review and analysis of the corrective action costs.  As noted previously, Shell's attentiveness vacillated when responding to the Wickenses' attorney, both prior to and after this suit was brought.  At times, Shell acted with expediency and responsibly, engaging actively in discussions aimed at identifying potential solutions, but at other times it acted with obvious lethargy and indifference.  Indiana's USTA authorizes a private right of action for contribution with respect to corrective action costs, even after the fact.  It also authorizes the recovery of attorney fees and court costs associated with pursuing contribution.  Not surprisingly, therefore, this litigation finally reached a point where Shell's only option was to accept responsibility for the clean-up in order to stop the hemorrhaging attorney and consultant fees.

Plaintiffs maintain that the USTA gives them (and other similarly-

situated private parties) the right to undertake the investigation and remediation of any demonstrated UST leak, without any constraint from or even input by the party allegedly liable for the clean-up and ultimately any litigation costs and expenses as well.  Indeed, a literal reading of Ind. Code § 13-23-13-8 does suggest that any person, including non-owners of property or even an environmental consultant, would be authorized to undertake unilaterally a UST clean-up and then bill the former owner-operator of the UST for all work performed in the process.  Obviously, such breadth invites abuses of these statutory powers.  However, as seemingly unlimited and one-sided as this statutory empowerment is, it is not without some limitations, for example, the allocation of corrective action costs is subject to the Court's "equitable considerations" and any award of attorney fees must be "reasonable."  These seemingly small stepping stones provide the Court with a foothold to prevent abusive enforcement of these statutory powers by an overzealous enforcer.

While clearly distinguishable on their facts, Shell's previous litigation with various landowners over contribution and reimbursement of fees and costs under the USTA has spawned the two, most instructive decisions interpreting Indiana law by Indiana courts.  *Shell Oil Co. v. Meyer*, 705 N.E.2d 962 (Ind. 1999) sets forth the Indiana Supreme Court's guidance for determining who is properly classified as an "operator," and thus the party or person ultimately liable for contribution, under the USTA.  However, the Court

in Meyer also summarily affirmed the lower appellate court's decision with

respect to costs and attorney fees (*Id.* at 981) which had held that only fees

reasonably incurred in pursuing a contribution claim are recoverable, not fees

incurred in bringing non-USTA claims.  *Shell Oil Co. v. Meyer*, 684 N.E.2d 504,

524 (Ind. App. 1997).  The Court wrote that:

> The amount of attorneys' fees awarded is within the trial court's
> sound discretion, and we will reverse only where an abuse of
> discretion is apparent.  *Stepp v. Duffy*, 654 N.E.2d 767, 775
> (Ind.Ct.App.1995), *trans. denied.* An abuse of discretion may occur
> if the trial court's decision is clearly against the logic and effect of
> the facts and circumstances before the court or if the court has
> misinterpreted the law.  *McCullough v. Archbold Ladder Co.*, 605
> N.E.2d 175, 180 (Ind.1993). Where the amount of the fee is not
> inconsequential, there must be objective evidence of the nature of
> the legal services and the reasonableness of the fee. *Posey v.
> Lafayette Bank and Trust Co.*, 583 N.E.2d 149, 152
> (Ind.Ct.App.1991), *trans. denied.*

*Id.* at 523.

"Court costs" are also recoverable by a Plaintiff who brings a successful

action under Ind. Code § 13-23-13-8.  However, the term "court costs" remains

undefined both in the USTA and by the Courts.  The Indiana Court of Appeals,

in *Shell Oil Co. v. Meyer*, ruled that it would be consistent with the state's

environmental policy and statutory scheme to allow a prevailing plaintiff to

recover, as part of "reasonable attorney fees and court costs," such costs as

paralegal fees, phone expenses, online research charges, postage, deposition

costs and expert witness fees.  *Id.* at 525.  However, as is true regarding

attorney fees, the amount of such incidental costs or disbursements is subject

to reduction for work done in pursuit of non-USTA theories of recovery.  *Id.*

We look to Indiana Professional Conduct Rule 1.5 for further guidance in

determining the reasonableness of attorney fees, which states:

> A lawyer shall not make an agreement for, charge, or collect an
> unreasonable fee or an unreasonable amount for expenses.  The
> factors to be considered in determining the reasonableness of a fee
> include the following:
>
>> (1) the time and labor required, the novelty and difficulty of
>> the questions involved, and the skill requisite to perform the
>> legal service properly;
>>
>> (2) the likelihood, if apparent to the client, that the
>> acceptance of the particular employment will preclude other
>> employment by the lawyer;
>>
>> (3) the fee customarily charged in the locality for similar legal
>> services;
>>
>> (4) the amount involved and the result obtained;
>>
>> (5) the time limitations imposed by the client or by the
>> circumstances;
>>
>> (6) the nature and length of the professional relationship
>> with the client;
>>
>> (7) the experience, reputation, and ability of the lawyers
>> performing the services; and
>>
>> (8) whether the fee is fixed or contingent.

Ind. Rules of Professional Conduct 1.5(a).

Factors one, three and seven above bear directly on the reasonableness

of an attorney's hourly rate and thus are less influential to our analysis here

because Shell has not challenged the reasonableness of Shere's hourly rate.  In

addition, it matters not that Shere had a contingency agreement with the

Wickenses because that agreement did not include Shell and cannot be enforced by or against Shell. *See Leibowitz v. Moore*, 477 N.E.2d 946 (Ind. App. 1985). What Shell strenuously challenges here is the reasonableness of the number of hours Shere has billed for his and others' services.[5] In making that determination, we look to the novelty and difficulty of the work performed by Shere, the value of the property involved and result obtained, the nature of the professional relationship between client and attorney and, to a degree, the ability of the lawyer.

Pursuing the owner-operator of a leaking UST some fifty years after that owner had sold the property on which the UST was located is not a simple legal task. Mr. Shere has established that he is adept at interpreting and enforcing the relevant environmental statutory provisions. And, though the legal work can not be fairly characterized as difficult, it certainly involves mastery of a body of law requiring an expertise not possessed by an untrained or experienced lawyer. That said, Shere's practice of salting into his communications with his adversaries unbecoming expressions of cynicism and condescension detracted from the otherwise high quality advocacy he has shown he is capable of. Further, such tactics eroded the process of give and take that otherwise facilitates an early resolution of a dispute. Shere's zeal

---

[5]Mark Shere's wife, Colleen Shere, is an attorney and performed some trial preparation work in December of 2006 at the request of her husband. Her time was billed at $265 per hour, without objection by Shell.

often threatened to obstruct and undermine his clients' as well as his own best interests.

Shell's objection to Shere's attorney fees, which amount equals three times the settlement figure paid by Shell to resolve the underlying litigation, is well-taken.  In fact, the result obtained on the merits of the dispute was nearly identical to that which could have been reached approximately fifteen months earlier, long before the not inconsiderable increment of fees and costs was incurred.  In addition, it should be noted that the relationship between the Wickenses and Shere changed during the course of the representation: Shere's initial assignment was to attempt to find a way to remove from the Wickenses the financial burden of the environmental clean-up which had to be undertaken which was impeding their ability to sell the property.  Sometime later, after Shere had accomplished that task, the relationship evolved into one in which the lawyer, himself, advocated to enlarge the scope and broaden the standard for the remediation, issues in which the Wickenses had virtually no interest or involvement personally, and which expansion gives every appearance of being motivated by Shere's personal interest in driving up his fees.

The guidelines included in Rule 1.5(a) of the Indiana Rules of Professional conduct are not intended to be exhaustive.  *See Shell Oil Co. v. Meyer*, 684 N.E.2d 504, 524 (Ind. App. 1997).  In determining what is

42

reasonable in terms of an attorney's fees, we take guidance from the holdings

of two courts - the Indiana Court of Appeals and the Seventh Circuit.  In *Weiss*

*v. Harper*, 803 N.E.2d 201, 208 (Ind. App. 2004), the Indiana appellate court

emphasized that attorney fees must reflect a responsible outlay of legal

services, and that each trial judge is entrusted with the power to draw upon

his/her personal experience when exercising the requisite discretion regarding

the reasonableness of the fees being sought by the prevailing party.  The shift

in Mr. Shere's roles from a paid advocate for the Wickenses to self-appointed

advocate for the depuration of the Wickens property and surrounding environs,

as well as personal financier of both the litigation and environmental efforts,

imposes major difficulties in our analysis.  We have no disagreement over the

importance of environmental litigation generally; indeed, it is often a socially

valuable, productive undertaking that more often than not results in little or no

financial reward. Nonetheless, having the upper hand in a litigation because of

certain statutory incentives to bring such a case does not entitle a plaintiff to

multiply the proceedings and churn the clean-up process beyond reasonable

limits, in anticipation of someone else being required to bear the financial

brunt of those excesses.[6]

_____

[6]The potential abuses that flow from the virtually unlimited ability of any person who is so inclined to undertake the process of securing a site clean-up and to shift the costs of doing so to a third party results from the 1991 amendments to the USTA enacted by the Indiana General Assembly, which have placed Indiana in a distinct minority of states who have adopted this approach.  Justice Boehm in writing for the Indiana Supreme Court in <u>Shell Oil Co. v. Meyer</u>, <u>supra</u>, at page 967, recognized the effect of this change in the statute and its potential for

Similarly, the Seventh Circuit has recently noted that, in cases involving clients who do not foot the bill for a particular litigation and thereafter request that the trial court award reasonable costs and fees, one measure of reasonableness is a determination of what the attorney would receive for the work performed from a paying client. *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000). In the Wickenses' case, they as "clients" reached a point of no longer having any significant or direct interest in prolonging the litigation; in fact, the position adopted by their attorney and their environmental consultant, HydroTech, was contrary in various ways to their

---

unrestricted costs and fees not unlike that which occurred here. We quote at length from the <u>Meyer</u> opinion because it helps to explain this court's inability to be more "reasonable" in our attorney fees and costs awards in the case at bar.

     *Indiana's Act has some provisions not commonly found in the statutes of the 45 states that have underground storage tank legislation. One significant difference is that Indiana's law does not limit the ability to seek corrective action to the state department of environmental management.* Rather, the Act includes a provision for recovery of corrective action costs and attorneys fees by a private party who successfully prosecutes a claim against an owner or operator.

     Unlike the corrective action provisions, the regulatory provisions in Indiana's Act are loosely based on the federal Resource Conservation and Recovery Act ("RCRA"). (Citation omitted) RCRA was first enacted by Congress in 1978 as an amendment to the Solid Waste Disposal Act. Provisions specifically dealing with petroleum storage were added in 1984. RCRA provides a comprehensive regulatory scheme governing the treatment, storage and disposal of solid and hazardous wastes. Indiana's Act contains a definition of "operator" identical to the one found in RCRA and in the UST laws of some other states. The Act's provision governing liability for costs, however, is unlike RCRA's citizen suit provision. RCRA allows suits against a past or present "generator," owner or operator only where the release presents "an imminent and substantial endangerment to health or the environment." (Citation omitted) Once a site has been cleaned up, private parties may not recover costs from owners or operators under RCRA. (Citation omitted) *In contrast, Indiana's law expressly anticipates payment of costs by owners and operators before or after cleanup....* (Emphasis supplied).

44

best interest given that no agreement had ever been reached with Shell that the costs of the expanded litigation would be borne by Shell or by Shere, himself. In short, it is implausible to think that a paying client would engage or expect its attorney to advocate for more or tougher residential environmental standards to be applied to the client's own commercial property.

In allowing a party who brings a successful contribution action under Indiana's USTA to recoup attorney fees, the state legislature was clearly attempting to spare a party who undertakes a voluntary clean-up from the costs of obtaining compliance with environmental standards by the alleged offender or polluter.  But, once a defendant accepts its legal obligation and agrees to assume responsibility for remediating the site, the burden- shifting fees portion of the statute has been been fulfilled.  Plaintiffs' argument that the attorney time expended by Shere following the offer by Shell to purchase the property from the Wickenses for the full list price resulted in the favorable negotiation of additional settlement issues, such as indemnity and a larger damages payment, misses the point.  The statute expressly provides for recovery of attorney fees for successfully obtaining contribution, not for pursuing other damages or a promise of a defense and indemnity.  The Indiana courts have made clear that: "The USTA does not authorize reimbursement of fees incurred in pursuing other non-USTA claims, regardless of how closely related those claims might be to the USTA claim." *Shell Oil Co. v. Meyer*, 684

N.E.2d 504, 524 (Ind. App. 1997)(parenthetical reference omitted).

Thus, in determining a reasonable attorney fee along with court costs in this case, we must determine when precisely, or as precisely as possible, the purposes Ind. Code § 13-23-13-8(b) were satisfied, after which point the efforts of counsel were no longer directed towards obtaining contribution from Shell. Shell contends that the line should properly be drawn at the point at which they offered to buy the Wikenses' property and allow a judgment to be entered against it, as reflected in its (admittedly flawed) Rule 68 Offer of Judgment. Shell submits that its offer to pay $40,000 in attorney fees at that time was entirely fair, and that, in no event, Plaintiffs are not entitled to more than $100,000.00 as reasonable attorney fees under any analysis.  We can accept a portion of Shell's argument, but not all of it.

At the point when Shell's December 12, 2006, Offer of Judgment was rejected, it became clear that obtaining Shell's 100% contribution for the clean-up was no longer Plaintiff's focus in this litigation.  Following the January 9, 2007 pre-trial, despite having been warned that the Court was concerned that attorney fees and costs had become the driving force in the litigation, Shere's services continued virtually unabated and in pursuit of other, secondary goals. In fact, when faced with Shell's efforts to assume responsibility for the clean-up and participate in the negotiation of remediation terms with IDEM, Plaintiffs balked, rather than deferred.

46

In their brief filed in January of 2007 in support of their Emergency Motion to Clarify and Reconsider, Plaintiffs relied on Ind. Code § 13-23-13-8 to argue that: "It is the Wickens' [sic] statutory right under USTA, not Shell's, to conduct the actual corrective action work and obtain payment from the responsible party." No such right in favor of the Wickenses arises under Ind. Code § 13-23-13-8. IDEM attorneys may have chosen, based on practical considerations, that in planning the remediation they would deal only with the owner of the property, as opposed to including the former operator of the UST. However, nothing in the statute provides the owner of the property with any greater right to pursue the clean-up and obtain payment for it than any other person who "undertakes corrective action resulting from a release from an underground storage tank regardless of whether the corrective action is undertaken voluntarily or under an order issued under this chapter." Ind. Code § 13-23-13-8(b)(2). Plaintiffs clearly did not possess the exclusive right to interact with IDEM regarding the course and scope of the clean-up and it was unreasonable for them or their attorney to run up the fees and costs of this litigation after the time when Shell had made it clear that it was willing to assume the contribution responsibilities ultimately incorporated into the final settlement agreement.

The amount of the attorney fees that are recoverable must accord with the attorney time spent litigating the Wickenses' USTA claim prior to the

January 2007 pre-trial conference.  Such fees would be reasonable under any
method by which they are calculated, including the Lodestar default model of
hours expended multiplied by reasonable billing rate.  An analysis of the
invoices submitted by Shere indicates that he is entitled to an award of
$400,897.00 for his and his wife's legal services through calendar year 2006.[7]
Adding the time spent in early 2007 through the January 9 pre-trial conference
computes to an additional 25 hours which, when multiplied by Shere's 2007
billing rate of $285.00 per hour, calculates to $7,125.00, which amount must
also be paid by Shell.  We deduct from that total of $408,022.00, the value of
attorney time devoted to non-USTA claims, as explained *infra*.

Mr. Shere's invoices reflect disbursements for typical litigation expenses,
such as deposition transcripts, copying and expert witness fees, which,
generally, are recoverable under Ind. Code § 13-23-13-8(b)(2).  *See Shell Oil Co.
v. Meyer*, 684 N.E.2d 504, 525 (Ind. App. 1997).  However, these
disbursements by Shere must be discounted to the extent that some portion of
them was devoted to non-USTA claims.  Shere's invoices also include various
HydroTech invoice charges paid by Shere, which invoices we have examined
separately in determining the portion of HydroTech's work devoted to corrective
action costs as opposed to litigation support.  Consequently, an accurate

---

[7]Plaintiffs have submitted time sheets from other attorneys who provided them with
assistance in this lawsuit.  However, we find no time entries for those attorneys which predated
our cut-off date of January 9, 2007.

computation of recoverable litigation support disbursements must necessarily include certain previously excluded expenses for work by HydroTech when analyzed in the context of corrective action costs.

Shere's invoices for his services through the end of 2006 included $21,822.36 in disbursements for costs related to expenses other than for HydroTech invoices.  To this number we add back the litigation support work performed by HydroTech, through January 9, 2007; this is essentially the amount we previously excluded from recoverable "corrective action costs."[8]  The total thus comes to $20,248.71, which amount, despite our prior criticism, includes HydroTech's duplication and oversight of NESA work in Stage Three.  However, that figure does not include the Stage Five oversight of August Mack or any other litigation-related work performed by HydroTech after January 9, 2007.  We have drawn the line at January 9, 2007, because on that date in the course of the status conference with the parties, the Court admonished them not to engage in fee-generating activities for a three-month period, to allow time to secure a neutral assessment of the required clean-up.  Further, as previously stated, the continued pursuit of this litigation at that point bore no relationship to the direct interests of the Wickenses nor did it promote or otherwise fulfill the underlying purposes of the legislative scheme.  Finally, in

---

[8]HydroTech's invoice #071021, dated January 11, 2007, shows a single entry subsequent to January 9, 2007, which we have excluded.  However, its invoice #071105, dated March 20, 2007, contains three entries for January 8 and 9, which we have included.

like fashion, HydroTech's litigation support must be discounted to the extent it related to Plaintiffs' non-USTA claims.

Shere has advanced six separate approaches for the Court to use in determining how much of his time was spent on claims other that the USTA claim or on overlapping issues.  Shere proffers these estimates of his allocations of time:  (1) attorney time based on time sheets, including Mr. Shere's interpretations of what issues overlapped, reflects that 96% of his time was compensable as pertaining to the USTA and related issues; (2) the amount of time spent by him on USTA or overlapping issues based on correspondence to Shell attorneys =100%; (3) the amount of time spent by him on the USTA or overlapping issues expenditures based on his e-mail correspondence with Shell attorneys = 100%; (4) the portion of the pleadings that related to the USTA claim or overlap = 89%; (5) the portion of the depositions which related to the covered USTA or overlap issues = 100%, and (6) a review of the 273 trial exhibits that indicates a total of 266 (or 97%) of which related to the USTA or overlap issues.  Plaintiffs thus suggest that the Court compute the average of these six measurements, which is 97%, and on that basis designate 3% of the fees set forth in Shere's invoices as work on non-USTA claims.

Shell's corresponding rationale for computing the number of hours of attorney time which should be excluded is similarly multifaceted.  First, it contends that the extensive redactions made to Shere's billings statements

50

prevent an accurate assessment of what specific work was related to each charage.  Shell also criticizes Mr. Shere's assessment of "overlap" as too broad and argues that his submission of attorney time expended that was not directed to USTA or the overlap issues is incomplete, citing as examples of time which Shere includes but actually should not be considered as overlap various discovery motions and depositions which were almost entirely related to non-USTA issues.  Another objection raised by Shell is Shere's billing for clerical work that he, himself, actually performed, such as making copies, filing and downloading, but billed at his full hourly attorney rate.  Unfortunately for us, Shell has not submitted a list of the specific entries which it challenges.  The volume of entries and heavy redactions by Shere does in fact make such a review considerably more difficult, but the Court is not in a position to perform that task for Shell.  We do agree, in general, with Shell's criticism of Shere's redactions and his overly broad description of overlapping issues.[9]

We find at least four of the six measurement methodologies suggested by Plaintiffs to have, at best, only limited use here.  A review of trial exhibits, for

---

[9]Citing *In re Estate of Inlow*, 735 N.E.2d 240 (Ind. App. 2000) as precedent, Shell also maintains that attorney fees incurred in presenting and defending a petition for fees should not be allowed under Ind. Code § 13-23-13-8.  We agree with Shell on this point:  the expense of presenting and defending a fee petition should not be considered a part of the statutory cost shifting .  It is more a cost of the attorney doing business, in the sense that he would not be expected to charge for any explanations of his invoices to a paying client. However, because we have already determined fees incurred subsequent to January 9, 2007 were not reasonable and, therefore, should not be recovered, we need not spend time dissecting the argument.

example, would obviously not uncover exhibits related to the numerous non-USTA counts which we have previously disposed of at the summary judgment stage.  Examining the communications between Shere and opposing counsel may reveal the nature of the work performed during a particular time period, but falls short of providing a reliable basis for computing percentages of time spent in litigating a given issue.  Finally, we find Mr. Shere's assessment of what issues  overlapped with the USTA claims, not unsurprisingly, to be self-servingly  generous.  We are confident in our assumption that various depositions and discovery battles  would not have occurred at all or would have been significantly scaled back were it not for Plaintiff's consistent efforts to expand their damages claim beyond those which could legitimately be recovered in connection with a USTA contribution claim and run up attorneys fees in the process.

We are persuaded that the attorney time entries along with an examination of the pleadings offer reliable measures of the amount of attorney time spent on non-USTA issues.  However, given the excessive redactions of time entries in those time records and Shere's overly-generous interpretation of "overlap," we choose to calculate the percentage of attorney hours devoted to USTA and overlapping issues at the same percentage, 89%, as the percentage of pleadings Shere claims were devoted to USTA and related claims.  That method applies equally well to the disbursements, which otherwise would defy

any sort of reliable analysis.

Accordingly, applying the 89% factor to the sum of the qualified fees and disbursements to which Plaintiffs' and Shere are entitled for their successful pursuit of the USTA claim, the computation proceeds as follows:

| | |
|---|---|
| Attorney fees through 1-9-2007 | $408,022.00 |
| | + |
| Litigation related cost & disbursements through 1-9-2007 | $ 42,071.07 |
| | _____ |
| | $450,093.07 |
| | x   .89 |
| | _____ |
| Reasonable fees and court costs | $400,582.83 |
| | + |
| Corrective action costs | $116,511.27 |
| | _____ |
| **Total Recovery Payable By Shell To Plaintiffs** | $517,094.10 |

***Prejudgment Interest***

Having determined the amount of reasonable attorney fees, court costs and corrective action costs, the question of whether prejudgment interest should be added to the final total remains for ruling.  Plaintiffs seek an award of prejudgment interest on all sums recovered by them, based on the Seventh Circuit decision in *Schott v. Rush-Presbyterian-St. Lukes Medical Center*, 338 F.3d 736, 744-45 (7th Cir. 2003).  Shell contends that the authorities cited by

Plaintiffs all relate to federal civil rights cases and have no precedential value relating to a fee award for a recovery under an Indiana statute and that, under Indiana law, the amounts awarded in this matter are not subject to prejudgment interest.

Under Indiana law, in determining whether prejudgment interest is allowable when a plaintiff's recovery is based on a theory not sounding in tort, the key issue is whether "the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation." *Bopp v. Brames*, 713 N.E.2d 866, 872 (Ind. App. 1999). Damages which are the subject of a good faith dispute, such as this challenge to the reasonableness of the attorney fees and costs incurred in this matter, do not give rise to an entitlement to any award of prejudgment interest. *Lumbermans Mut. Cas. Co. v. Combs,* 873 N.E.2d 692, 724-25 (Ind. App. 2007). Shell is correct: federal civil rights statutes/holdings do not constitute controlling precedent for an award of prejudgment interest in the case at bar. Prejudgment interest shall not be awarded here.

### *Conclusion*

For the reasons detailed in this entry, Plaintiff's Petition for Attorney Fees and Corrective Action Costs (Doc.#267) is **GRANTED IN PART**. A separate and final judgment in favor of Plaintiffs shall issue in the total amount of Five

Hundred Seventeen Thousand Ninety-four Dollars and Ten Cents

($517,094.10), representing recoverable corrective action costs, attorney fees

and court costs.

IT IS SO ORDERED.  08/01/2008

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Harry Nicholas Arger
DYKEMA GOSSETT ROOKS PITTS
PLLC
harger@dykema.com

Gregory P. Cafouros
KROGER GARDIS & REGAS, LLP
gpc@kgrlaw.com

Anne L. Cowgur
BINGHAM MCHALE LLP
acowgur@binghammchale.com

Frank J. Deveau
TAFT STETTINIUS & HOLLISTER
LLP
fdeveau@taftlaw.com

Andrew Rudolph Falk
KROGER GARDIS & REGAS LLP
arf@kgrlaw.com

David L. Guevara
TAFT STETTINIUS & HOLLISTER
LLP
dguevara@taftlaw.com

Lee T. Hettinger
DYKEMA GOSSETT ROOKS PITTS
PLLC
lhettinger@dykema.com

Miriam A. Rich
GONZALEZ SAGGIO & HARLAN LLP
richm@gshllp.com

Mark Eliot Shere
ms@sherelaw.com

Brad R. Sugarman
TAFT STETTINIUS & HOLLISTER
LLP
bsugarman@taftlaw.com

Rosa Maria Tumialan
DYKEMA GOSSETT ROOKS PITTS
PLLC
rtumialan@dykema.com

Jeffery Alan Whitney
GONZALEZ SAGGIO & HARLAN LLP
jessica_davis@gshllp.com