UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DANIEL J. WICKENS and PAMELA M. WICKENS, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>SHELL OIL COMPANY and SHELL OIL PRODUCTS COMPANY, LLC., )<br>)<br>Defendants. ) | 1:05-CV-645-SEB-JMS |

**ORDER DENYING DEFENDANTS' MOTION TO VACATE JUDGMENT
AND GRANTING IN PART DEFENDANTS' MOTION TO ALTER OR MODIFY**

We return once again to this protracted litigation in hopes of finally resolving the long festering disputes among the parties, which now embroil their attorneys and insurer as well. A negotiated settlement of the underlying substantive claims in this lawsuit reserved the issue of an appropriate award of reasonable attorney fees and corrective action costs, pursuant to Indiana's Underground Storage Tank Act ("USTA"), Ind. Code § 13-23-13-8(b), for the Court to decide. On May 12, 2008, a hearing was held on Plaintiffs' Petition for Attorney Fees and Corrective Action Costs and thereafter an order and judgment were entered awarding Plaintiffs a total of $517,094.10 in attorney fees and costs. The award and judgment were primarily based on our review and determination of the environmental consultant costs attributable to the investigation of contamination for

purposes of remediation as well as the costs associated with reasonable steps taken in prosecution of the USTA claim. We also examined the services provided by Plaintiffs' attorneys to determine whether and, if so, when they were provided at a time when obtaining Shell's contribution to the environmental investigation and remediation of the property at issue was no longer at issue. Our consideration led us to identify January 9, 2007, as the point in time after which Plaintiffs' attorneys' efforts were clearly aimed at obtaining goals secondary to securing Defendants' commitment to finance the clean-up of the property, and based on that date, the award of fees and costs was appropriately adjusted.

Defendants, Shell Oil Company and Shell Oil Products Company, LLC (collectively "Shell"), filed a timely Motion to Alter or Modify Judgment, pursuant to Fed. R. Civ. P. 59(e), arguing that the cut-off date (of January 9, 2007) should have been set at an earlier time with respect to the award of attorneys fees and, further, that approximately two months of the consultant's services should also have been eliminated as not being reasonable corrective action costs. After Defendants' motion was filed, several *pro se* submissions were filed by Plaintiff Daniel Wickens, the substance of which prompted Shell to file a second post judgment motion, to wit, a Motion to Vacate Judgment, pursuant to Fed. R. Civ. P. 60, in which they asserted that fraud and misrepresentation on the part of Plaintiffs and/or their attorney and insurer had resulted in this court's entry of an unjust judgment against them. At the heart of Defendants' second

post trial motion was the revelation, based on the *pro se* filings, that a previously undisclosed insurer of the Wickenses, Employers Fire Insurance Company ("Employers"), had actually been involved from the outset in the prosecution and financing of this litigation as well as the environmental investigation. Shell argued that not only had Plaintiffs' counsel, Mark Shere, concealed the role of the insurer from Shell as well as the Court, but that, at the hearing conducted to consider his fee petition, Shere had misrepresented other facts which also mislead the Court and rendered the Court's decision unjust.

After granting Shere's and Employer's motions to intervene as real parties in interest, a hearing was held on Shell's motions on April 27, 2009. At the hearing, Dean Cooper, an environmental claims consultant employed by Employers' parent company, OneBeacon Insurance, was called by Shell as a witness. Cooper testified regarding Employers' response to the Wickenses' demand that they be indemnified and defended in response to the letter ("PRP letter" ) they had received from the Indiana Department of Environmental Management (IDEM), which identified them as potentially responsible parties and required them to further investigate the petroleum contamination identified on their property. Mr. Cooper testified that Employers had agreed to engage Mr. Shere, who was already representing the Wickenses, to continue representing the Wickenses in connection with the environmental investigation and potential remediation requirements. Cooper explained the details of that agreement and detailed the payments Employers had

made both for attorney fees and to cover environmental consulting costs, including identifying certain documents which Shell offered into evidence.

We discuss below the separate contentions made by each participant at the hearing, but pause first to address a "housekeeping" issue.  Mr. Shere offered a binder of exhibits during the course of his presentation; his presentation, like those of the other parties, was necessarily compressed in view of scheduling limitations.  We agreed to allow Shere an opportunity to submit and explain any exhibits he had not yet discussed during the course of his in-court presentation in a post-hearing brief.  We also allowed Shell the opportunity in its post-hearing brief to object to any of Shere's exhibits.  Shell has now interposed objections to Shere's Exhibits #44, #46, #49 through #55, #57 through #59, #63, #73, and #75 through #79, on relevance grounds.  After review, we agree, generally, that the relevance of many of those exhibits is dubious, but, because this hearing was conducted before the Court as opposed to a jury, for efficiency sake we hereby overrule Shell's objections, given the Court's ability to sort through the submissions to determine the portions of each that have relevance to the issues before us.  *See United States ex rel. Placek v. Illinois,* 546 F.2d 1298, 1305 (7th Cir. 1976); *United States v. Menk*, 406 F.2d 124,127 (7th Cir. 1968).

### *Daniel Wickens*

What Mr. Wickens raised with the Court at the hearing turned out to be of limited

relevance to the issues remaining for decision and, to the extent Mr. Wickens and his wife seek to obtain an award of damages against Mr. Shere or their insurer, we again rule that such a claim is not and shall not at this late juncture be made a part of this lawsuit. However, during the course of his oral presentation, Mr. Wickens stated that he was retracting a key assertion which he had made in his *pro se* submissions. Previously, Mr. Wickens had represented that he never authorized the filing of this lawsuit, which statement substantially influenced Shell's decision to file its Motion to Vacate as well as the Court's decision to conduct yet another hearing to address the pending post-judgment motions in order to obtain additional factual clarification. Were the Court to conclude based on the evidence before it that this lawsuit had never been authorized by Mr. Wickens, issues far more significant than those relating to whether our previous determination of reasonable fees and corrective action costs was appropriate and just would require our attention. Mr. Wickens's retraction, considered along with Mr. Cooper's testimony, has provided important clarification as to the actual circumstances underlying the prosecution of the USTA portion of this lawsuit. Beyond that, little of relevance was provided by Mr. Wickens's presentation at the hearing.

*Shell*

Shell presented evidence primarily through the examination of Mr. Cooper, based upon which it argued strenuously that our prior award of fees and costs must be reduced. Shell maintained that an earlier date was the appropriate time for designating when the

goals of the prosecution of the USTA action had been fully satisfied thereby making any further litigation unnecessary.  In its post-hearing brief, Shell pressed the Court once again to grant its Motion to Vacate, which was based upon the fraud or misrepresentation by Employers and/or Shere.  However, Mr. Wickens's retractions regarding his authorization of this litigation released much of the steam from Shell's argument relative to completely vacating the prior judgment, which Shell's counsel seemed to acknowledge by the time he concluded his arguments at the hearing.  Shell's focus thus has returned to challenge of the scope of the environmental consulting fees assessed by of HydroTech, and the amount which the Court previously awarded as attorney fees and corrective action costs.  Shell contends that at least  three alternative dates are more appropriate as points for "drawing a line in the sand" regarding Plaintiffs' entitlement to an award of attorney fees and related costs.

Shell contends that two of the Hydrotech invoices (#071210 & #071231), which we previously allowed as recoverable corrective action costs should not have been assessed, against Shell because the work performed was pursuant to a plan which IDEM had accepted only with contingencies and also because the scope of the work represented costs which should properly be deemed investigatory steps rather than remediation.  As indicated in our order of August 1, 2008, "exposure assessment" is a defined term, *see* Ind. Code § 13-11-2-75, and includes the type of investigatory activities which Hydrotech engaged in and billed for in the two invoices at issue.  The USTA specifically allows the

costs of exposure assessment to be recovered as a part of corrective action costs under Ind. Code § 13-23-13-3. Whether IDEM accepted Hydrotech's plan with or without contingencies is of no significance here. Part of the risk accepted by Shell when it chose not to accept the Wickenses' early demand that it immediately accept full financial responsibility for all clean-up activities stemming from the first IDEM letter was that whatever exposure assessment work was performed or proposed might not be specifically agreeable to Shell. So long as the exposure assessment activities were within reason, and there is no evidence suggesting they were not, Shell's choice to expend additional time in assessing its potential liability, whether ultimately justified or not, imposed on Shell the responsibility for picking up the tab for that work.

Alternatively, Shell asks us to consider three alternative dates, each prior to January 9, 2007, which Shell contends more accurately reflect the time when the cessation of activities occurred which the USTA fee shifting provisions are intended to cover, to wit, the financial obligation of the responsible party for any corrective action costs required as a result of a leak or spill from an underground storage tank. We do not quarrel with Shell's description of the goal or purpose of the USTA's fee shifting provisions, but the dates proposed by Shell as alternative "cut-off" points do not accurately match up with points in time when Plaintiffs had obtained a sufficiently firm commitment from Shell to signal to Plaintiffs that a continuation of their litigation and environmental assessment efforts was unreasonable.

The first date proposed by Shell--July 13, 2005--was only a few months after the date on which Plaintiffs' complaint was filed.  Shell contends this was the date identified by the Court in our prior ruling when Shell made its first commitment to remediate the Wickenses's property during a pretrial conference held before the Magistrate Judge. However, in our August 1, 2008, order we described the proceedings that occurred at that initial pretrial conference to include not only Shell's commitment to clean-up any pollution which may have come from its tank on the Wickenses' property, but also its firm refusal to accept the responsibility for the whole of the contamination described by IDEM, which included petroleum contamination discovered from borings taken from the nearby Gardner property, a site where another gasoline filling station was formerly located.  IDEM's combining of the two properties in one PRP letter likely resulted from Hydrotech's peculiar strategy in providing data to IDEM from both sites based on its preliminary investigation.  Nevertheless, correctly or not, it was IDEM that combined the two locations as one site, not Plaintiffs, and Plaintiffs lacked the power to change IDEM's approach and to accept Shell's partial acceptance of responsibility for the clean-up.

In addition, as discussed in the pre-hearing briefs, the record reflects that on July 1, 2005, Plaintiffs first proposed a standstill agreement towards the goal of limiting Shell's obligation to respond in good faith to the IDEM letter and accept responsibility for the contamination on the Wickenses' property which emanated from leaks in the underground storage tank.  Plaintiffs' proposed standstill agreement was rejected in a

letter sent by Shell which post-dated the initial pretrial conference. Thus, it is clear that Shell's express position at that point did not include a commitment which could or should have persuaded Plaintiffs and their counsel discontinue this litigation.

As its second proposed alternative cutoff date, Shell contends that attorney fees and costs incurred after August 21, 2006, should be deemed unreasonable because it was at this point when Shell submitted its work plan in response to IDEM's request, thereby demonstrating its commitment to clean up the Wickenses' property. However, Shell's proposed work plan never was approved nor was it accompanied by any express commitment to the Wickenses to indemnify them for the entirety of the costs of remediation. Further, as of this time, Shell was continuing to assert that some of the contamination resulted from conditions on the Gardner property flowing onto the Wickenses' property, despite strong evidence to the contrary. Clearly, a reasonable interpretation of Shell's response to IDEM is that it signaled Shell's readiness to "throw in the towel" in terms of its continued dispute over responsibility for the contamination, but without some explicit communication to that effect sent to Plaintiffs, we can not say that it was unreasonable for the Wickenses, Employers and Shere to press on with their litigation.

Shell's final theory regarding a more reasonable cut-off date for Plaintiffs' recovery of attorney fees is November 21, 2006, the date on which Shell made a firm offer of settlement which included its acceptance of responsibility for one hundred

percent of the future corrective action costs, for purchasing the property and for deferring a final determination of reasonable costs and fees by the Court.  Shell's offer to this effect was made orally during the Court-supervised settlement conference.  Lacking knowledge of all the relevant details, we nonetheless know, based on a November 30, 2006, e-mail, that Plaintiffs conditioned their acceptance of this offer by Shell on the payment of an additional $35,000.00 to the Wickenses as well as the payment of Plaintiffs attorney fees and costs totalling $425,000.00.  This, Shell argues, is evidence that, though Plaintiffs had obtained from it the commitment which the statutory scheme was designed to ensure, Plaintiffs continued to demand more.  Shell introduced evidence substantiating that Employers had paid, or agreed to pay, $212,410.34 as of that November 21, 2006, date and requests that the Court therefore limit Plaintiffs' recovery of attorneys fees and and costs to that amount.

     Shell's argument is convincing on at least one level:  the offer in November 2006 strongly resembles the agreement eventually reached many months thereafter, following the run up of considerably more fees and costs.  Plaintiffs' counsel's efforts at this point to collect attorneys fees and repayment of costs from Shell clearly appear to be driving the litigation.  That said, such efforts by counsel admittedly are a routine part of virtually all settlement negotiations.  The challenging task facing the Court is to determine as reliably as possible when, with an agreement in hand from a responsible party to accept remediation responsibility, the haggling over fees and costs, became a separate dispute

and thus "unreasonable" in terms of making Shell pay for it.  Regardless of the analytical approach applied by the Court in reaching this decision, a degree of subjectivity is involved.  We are slowed in our analysis by a paucity of factual detail regarding the verbal offer Shell appears to have made during the November 21, 2006, settlement conference.  Nonetheless, the record is clear that Shell subsequently rejected the Magistrate Judge's December 2006 settlement proposal which included terms very similar to those which Plaintiffs had previously agreed to.  The rejection of that proposal does not support Shell's current insistence that November 21, 2006, is the point at which continuation of the litigation became unreasonable.  Thus, we affirm our prior finding that the January 9, 2007, date is the appropriate cut-off point for fees.  In addition, we hold that following January 9, 2007, the record unequivocally demonstrates that Plaintiffs' efforts were directed at seeking to control the course of the clean-up, rather than simply to secure a commitment from Shell to remediate the site.

On January 9, 2007, during a conference with the attorneys, the Court specifically opined to the parties that, in our judgment, the underlying substantive dispute between them was being taken over by tangential issues including the run up of fees.  Thus, a stay was imposed of all future deadlines and all further rulings were held in abeyance.  The Court also laid out a plan by which the parties would assist in resolving the secondary issues which were standing in the way of a final agreement among them.  The parties were ordered to report back to the Court following their negotiations no later than April

11, 2007, and were further informed that no party would be permitted to accrue attorney fees or expert witness fees payable by the other between January 10, 2007, and the date the parties reported back to the Court. Plaintiffs' "Emergency Motion to Clarify and Reconsider"(Doc. #213) made clear Plaintiffs' continued refusal to curtail such expenditures and revealed their motivation to continue and expand the litigation beyond any reasonable limits.

In that "Emergency Motion" filed by Plaintiffs, their counsel erroneously asserted that the Wickenses had an absolute statutory right to conduct corrective action in whatever manner they chose, without regard to Shell's expressed willingness to accept complete responsibility for negotiating and executing a response to IDEM's allegations. As stated in our original entry awarding attorney fees, IDEM may have preferred to deal with the property owner, but nothing in the relevant statutes gives Plaintiffs the exclusive right to direct the clean-up. To the contrary, as we have previously noted, the language of Ind. Code § 13-23-13-8 does not limit the right to take or direct corrective action only to the owner, or to a potentially responsible party or any other specific person or entity. Conceivably, the owners of an adjacent property--for example, the Gardners--or even an unnamed party could have by law joined the battle for control of the environmental clean-up of the Wickenses property. The Indiana USTA neither creates an exclusive right nor defines an order of preference among those exercising such powers. For what it's worth, in our opinion, this is a central weaknesses in the statutory scheme, contributing as it does

to the difficulty of judicial oversight and enforcement.  Absent an exclusive statutory directive or other authorization to control the process of remediation of the property, Plaintiffs continued insistence that they possessed such a right carried this litigation beyond the point where the purposes underlying the fee shifting provisions of the statute were being served.  Accordingly, we hold that the continued accrual of attorney fees from this point forward by Plaintiffs and, in particular, by Mr. Shere, was unreasonable and Shell is not obligated to pay those amounts.

     Shell also, legitimately in our view, objects to the claim for fees payable to Mr. Shere's wife, which objection we hereby sustain.  In his invoice for services rendered during December 2006, Mr. Shere included a claim for $9,275.00 under the category labeled "Fee for attorney services" for "C. Shere (review and revisions to briefs, work on trial exhibits) – 35.00 hours."  This line item reflects time spent by Mr. Shere's wife, Colleen Shere, apparently an attorney but whose license had been in inactive status since 2005.  Whether her work was helpful or significant or valuable to the case is beside the point because Mr. Shere misrepresented her (or his) entitlement to reimbursement for those services when he included them in his invoice as charges for "attorney services" when they were, in fact, services provided by a person not currently licensed to practice law in this jurisdiction.

     Rule 5.5 of the Rules of Professional Conduct permits such services to be rendered, and thus properly labeled as attorney time on an invoice, <u>only</u> if the lawyer is

licensed in another jurisdiction and is merely providing temporary services within Indiana in association with a properly admitted lawyer.  Though Mr. Shere represents that it is common for law firms to bill the time of persons awaiting licensure as new attorneys in a particular jurisdiction and thus no harm came from his charging for his wife's services, we know of no such allegedly "common practice."  To the extent lawyers who are not licensed to practice generate billable "attorney fees," in contrast to paralegal charges or some other similar non-lawyer designation, that practice would contravene Rule 5.5.  In any event, we were informed that Mrs. Shere is not a recent law school graduate who was simply awaiting her bar exam scores and there is no evidence that she was licensed in another jurisdiction.  Further, Mr. Shere does not attempt to explain away these charges as a mistake on his part in describing the nature of her services.  Accordingly, the charges assessed for her services as "an attorney" shall be deducted from the previous computation of recoverable fees, and the judgment shall be amended to so reflect.

### *Attorney Mark Shere*

Mr. Shere's presentation at the hearing and his supplemental arguments in his post-hearing brief were primarily devoted to his request that the Court set aside or rescind its previous references to various practices by him which the Court viewed as unprofessional.  Mr. Shere, understandably, desires to rehabilitate his professional reputation in light of the Court's criticisms. When the Court issued its order of August 1, 2008, and the related orders thereafter, a complete evidentiary record was

lacking. Additional evidence and supplemental briefing have now been submitted. Thus, the Court concedes that, given Shere's recent explanations and elaborations as well as Mr. Wickens's retractions and pro se submissions, it may have inferred too much from the record before it in ruling on the petition for fees. Without explicitly retracting any specific criticisms at this point, the Court nonetheless yields to the findings of the Indiana Disciplinary Commission handed down in response to a grievance filed by Mr. Wickens against Mr. Shere, in which the Commission found no misconduct had been engaged in by Mr. Shere warranting disciplinary action.

That said, this court's criticisms of certain actions by Mr. Shere stand. For example, following our review of the written submissions relating to Shere's attorney fee petition, the Court scheduled a hearing, announcing in advance that it intended to use that session to elicit the parties' responses to a series of specific issues which it described as matters of "particular concern." One of the identified issues posed by the Court in that notice was: "What was the fee arrangement between Plaintiffs, their attorneys and Hydrotech?" During the hearing, the Court engaged in an extended colloquy with Mr. Shere, from which the Court's desire and need to understand the roles and identities of all persons or entities participating in the financing of this litigation and/or participating in the development of the response to IDEM and the prosecution of this lawsuit were made unequivocally clear. Mr. Shere nonetheless completely failed to disclose to the Court anything regarding Employers' role as the insurer and underwriter of the costs being

incurred in this IDEM action, an omission that was both telling and inexcusable by an officer of the court.  Even assuming that the insurer had expressly requested that its identity not be disclosed, such a request does not justify counsel's silence under these circumstances.  As it turns out, Employers was not Mr. Shere's client, so he had no legal duty to Employers.  As far as Mr. Shere was concerned, Employers was merely the payor of his bills for services that he provided to the Wickenses.  Employers' role clearly should have been disclosed to the Court in response to the Court's direct inquiry of Mr. Shere.

In addition, as previously discussed, the standards of professional conduct for attorneys do not permit billing for services expended by an unlicensed attorney who has been described as being a licensed attorney.  This may seem a trivial matter to Mr. Shere, who we assume made the decision regarding the method and manner of billing for her time.  However, the Court does not regard this matter as minor.  In fact, it represents an unsettling and discouraging failure by counsel, particularly in light of his otherwise considerable legal skills, and was left to be ferreted out by opposing counsel and brought to the Court's attention.

These actions by Mr. Shere regretably represent a departure from acceptable conduct by an attorney litigating in our court.

### *Employers*

Employers clearly played the least significant role in the prosecution of this action.

Employers' interests here are accordingly less significant: it paid, as it apparently was required to do under its contract of insurance, for Hydrotech's services and a substantial portion of Mr. Shere's attorney fees.[1] Employers' involvement began when Mr. Shere contacted it on behalf of Mr. Wickens to inform it of the PRP letter issued by IDEM and to request that the company defend its insureds. Employers appears to have made no strategic decisions either with regard to effecting the clean-up of the site or the conduct of this litigation.

Under Indiana law, an insurer whose insured has been sent a PRP letter owes the insured a defense, just as if a lawsuit had been filed. *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285 (Ind App. 1997). Employers issued a reservation of rights to the Wickenses but agreed to allow and pay for Mr. Shere to continue representing them and, in turn, to pursue Shell in order to attempt to recover the costs of any remediation. In light of the legal requirement that Employers provide a defense in response to the PRP letter, even if Mr. Wickens had not approved the filing of this lawsuit, under subrogation principles Employers' pursuit of Shell to recover its costs as the insurer would be an ordinary and expected approach in such context.

---

[1]Employers agreed to pay Mr. Shere an hourly fee of $170 per hour, regardless of his success in managing this litigation. There was a separate agreement with regard to his fee entitlement, allowing Mr. Shere to be compensated at or near his regular rate, if he was successful in prosecuting this case. As noted in our original order, Shell posed no objection to Mr. Shere's regular hourly rate beginning at $235 in 2004 and progressing to $300 by 2008. The testimony of Mr. Cooper at the hearing further confirmed the reasonableness of those regular rates.

We do not disagree with Employers and Mr. Shere that, at least during the course of the lawsuit predating the attorneys fee petition, there was no legal requirement that Employers be identified as the insurer.  However, by the time the procedural complications and impediments had arisen with respect to the settlement efforts in this case as well as the Court's intervention in adjudicating attorneys fees, given the Court's direct inquiries of Plaintiffs' counsel in an effort to determine the lines of authority for this case, the obfuscations and secrecy of Mr. Shere should have given way to honesty and candor on his part.  Employers' obvious lack of attention and apparent indifference to this protracted litigation, which had developed into an exceedingly contentious battle over a very small piece of real estate, are inexplicable in terms of reasonable business practices and even though such neglect by Employers is not technically sanctionable, it is not easily excused.  We assume Employers must have believed it had no choice, given its contractual and legal obligation to fund this defense of its insured, but its passivity contributed to the run up of fees and costs by Shere and Hydrotech, not to mention the prolongation of this dispute.  As we have now twice determined, however, Employers is entitled to recoup its fees and costs from Defendant in the amounts we herein specify.

### *SUMMARY*

Shell's Rule 60 Motion to Vacate is based on claims of fraud and misrepresentation by Plaintiffs and their representatives, but the conduct engaged in by Mr. Shere and Employers does not support the relief requested, nor does it provide a

sufficient basis on which the Court would be justified in vacating its previous judgment. Accordingly, Defendant's Motion to Vacate (Doc. #317) is DENIED.

The award of attorney fees, which previously included charges covering the work of a person not currently licensed to practice law in Indiana, requires a downward adjustment. Accordingly, the amount of the judgment shall be reduced by the amount previously erroneously awarded for Colleen Shere's legal services. Defendants' Motion to Modify or Alter Judgment (Doc. #288) is to this extent therefore GRANTED. The Court's previous award shall be and is hereby reduced in the amount of $9,275.00 to a total of $507,819.10. The Motion to Modify or Alter Judgment is DENIED in all other respects.

IT IS SO ORDERED

Date: 06/03/2009

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Harry Nicholas Arger
DYKEMA GOSSETT ROOKS PITTS PLLC
harger@dykema.com

Miriam A. Rich
GONZALEZ SAGGIO & HARLAN LLP
richm@gshllp.com

Mark Eliot Shere
ms@sherelaw.com
William G. Stone
STONE & JOHNSON
wstone@stonejohnsonlaw.com

Rosa Maria Tumialan
DYKEMA GOSSETT ROOKS PITTS PLLC
rtumialan@dykema.com

Daniel & Pamela Wickens
910 Isabelle Drive
Anderson, IN 46013